# CHARLESTON.

### STATE *v.* E. E. MORRISON
### (No. 5238.)

Submitted January 27, 1925.    Decided February 24, 1925.

1. STATUTES—*When Ejusdem Generis Rule of Construction is Used Stated.*

   The *ejusdem generis* rule of construction is only used to aid in determining the meaning of a statute which is of doubtful import, and is never invoked where the intent of the statutes is to be found in the ordinary meaning of the words used. (p. 298).

   (Statutes, 36 Cyc. p. 1121.)

2.  PHYSICIANS AND SURGEONS—*Treating Ailments by Chiro-practic Method Held "Practicing Medicine and Surgery."*

One who opens an office and announces to the public in any way that he is ready to treat the sick and afflicted, and has actually treated cases of paralysis, constipation, rheumatism, neuritis, sick headache, kidney trouble, lumbago, liver trouble and divers other diseases by adjustment of the segments of the spinal column according to the chiropractic method of treating human ailments and infirmities, is practicing "medicine and surgery" as defined by Sec. 12, Chap. 11, Acts 1915 (now found in Barnes' Code of 1923 as Sec. 8a, Chap. 150). (p. 298.)

(Physicians and Surgeons, 30 Cyc. p. 1561.)

3.  CONSTITUTIONAL LAW—PHYSICIANS AND SURGEONS—*Requirement of Examination and License to Practice Medicine Held Constitutional.*

The provisions of said Chapter 150 Barnes' Code of 1923, requiring examination of and license to a person before he can lawfully practice medicine and surgery as therein defined, and imposing penalty for practicing without such license, is applicable to a chiropractor who treats human ailments and infirmities for reward as such, and is not in contravention of Sections 1 and 10, Art. III of the Constitution of West Virginia, nor of Section 1 of the 14th Amendment to the Constitution of the United States. (p. 300).

(Constitutional Law. 12 C. J. §§ 459. 841; Physicians and Surgeons, 30 Cyc. p. 1547.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Raleigh County.

E. E. Morrison was convicted in the criminal court of Raleigh county for practicing medicine and surgery without a state license, and conviction was affirmed on writ of error to the circuit court, and he brings error.

*Affirmed.*

*McGinnis, Maxwell & McGinnis,* and *Poffenbarger, Blue & Dayton,* for plaintiff in error.

*E. T. England,* Attorney General and *R. Dennis Steed,* Assistant Attorney General, for the State.

LIVELY, PRESIDENT:

E. E. Morrison was indicted in the criminal court of Ra-
leigh County for practicing medicine and surgery as defined
by Chapt. 150, Sec. 8a, Code 1923, without first having ob-
tained a State license to do so. The sufficiency of the in-
dictment was challenged by a motion to quash and by de-
murrer, both of which were overruled. Upon a plea of not
guilty the case was submitted to the court upon an agreed
statement of facts. The court found the defendant guilty
and entered its judgment assessing against him a fine of
$50.00. Upon writ of error to the Circuit court the judg-
ment was affirmed. This writ followed.

It appears from the agreed statement of facts that the
defendant practices the profession of chiropractic which, as
defined, consists ''of the palpitation and adjustment with
the human hands of the movable segments of the spinal
column of the human body to normal position for the pur-
pose of releasing personal impulses and impinged nerves'';
that said practice does not include the administering or pre-
scribing of drugs or similar agency, nor the performance
of any surgical operation; that on the first day of October,
1922, the defendant came to Beckley, West Virginia and
opened an office for the purpose of practicing his profes-
sion as a chiropractor by the means aforesaid, and that the
defendant advertised that he could by chiropractic methods
cure backache, headache, nervousness, liver and kidney dis-
orders, etc. It further appears from the statement of facts
submitted that in the month of October, 1923, and within
one year from the date of the finding of the indictment, the
defendant treated by chiropractic methods, and without the
use of any drugs, powders, pills or any surgical method, Al-
fred McKinney, for neuritis, and Mrs. G. C. Meadows, the
prosecuting witness, for periodical sick headache, for which
services each of the parties paid him a fee of $25.00; that
defendant has adjusted and attempted to cure the ailments
of several hundred people, including men, women and chil-
dren, by the application of his said science, which, said ail-
ments included paralysis, constipation, rheumatism, neuritis,

sick headache, kidney trouble, lumbago, liver trouble and divers other diseases; that defendant in the treatment of these cases prescribed no drugs and performed no surgical operations; and that defendant attempted to cure the human ailments hereinbefore set out and in the way aforesaid, without at any time having a license to practice medicine and surgery as defined in the 1923 Code of West Virginia.

The statutes applicable to the case are Sections 8a, 9, 10 and 11, Chap. 150, Code 1923, and for convenience are here quoted:

> Sec. 8a. "The public health council, consisting of the commissioner of health and six other members as specified in section three of this act, shall, in addition to the duties hereinbefore or hereinafter specified, examine all applicants for license for the practice of medicine and surgery in this state, and issue certificates of license to all applicants who are legally entitled to receive the same; and said certificates of license shall be signed by the president of the council and by the commissioner of health as secretary therefor. The examination of applicants and the issuing of certificates of license thereto shall be governed by sections nine, ten and eleven of chapter one hundred and fifty of the code of West Virginia, and the words 'state board of health,' wherever used in said sections, shall mean public health council, as established by this act. The term 'practice of medicine and surgery' as used by this act shall be construed to be treatment of any human ailment or infirmity by any method. To open an office for such purpose, or to announce to the public in any way a readiness to treat the sick or afflicted, shall be deemed to engage in the practice of medicine and surgery within the meaning of this act; provided, this clause shall not apply, however to regularly registered optometrists."

> Sec. 9. "The following persons and no others shall hereafter be permitted to practice medicine in this state. (1) All such persons as shall be legally entitled to practice medicine in this state at the time of the passage of this act. (2) All such persons as shall be graduates of class 'A' medical schools, as classified by the council on education of the American medical

association and American association of medical colleges and then only from such schools when so classified as do require as a condition to entrance upon the study of medicine at least two years of academic work of collegiate grade in a standard college of arts and sciences of equal rank with the college of arts and sciences in the University of West Virginia, who shall pass an examination before said public health council and shall receive a certificate therefrom as hereinafter provided. Provided, however, that the public health council, or a majority of them may accept in lieu of an examination, the certificate of license to practice medicine legally granted by the state board of registration or examination or licensing board of another state, territory or any foreign country whose standard of qualification for the practice of medicine is equivalent to that of this state, and grant to the said applicant a certificate of license to practice medicine in this state; provided such states, territories or foreign countries accord like privileges to licentiates of this state. The public health council shall at such times as a majority of them deem proper, hold examinations for the licensing of practitioners of medicine; such examinations shall not be less than two during the year, and shall be held at such points in the state as shall be most convenient for those presenting themselves for examination, or to the public health council; at such examinations, written and oral questions shall be submitted for the applicants for license, covering all the essential branches of the sciences of medicine and surgery, and the examination shall be a thorough and decisive test of the knowledge and ability of the applicants. The president and secretary of the public health council shall issue certificates to all who successfully pass the said examination and to all those whose certificates said public health council or a majority of them shall accept in lieu of an examination as hereinbefore provided, except that in all the certificates issued to applicants who adhere to the osteopathic school it shall appear that it is for the practice of osteopathy, and such certificates after being duly recorded as hereinafter provided, shall be deemed licenses to practice medicine, surgery and osteopathy in all their branches in this state. The public health council shall give timely notice of the time and place of holding such examinations in at least

three newspapers of general circulation in this state, and all such persons wishing to present themselves for examination shall notify the secretary and comply with the rules of the public health council. No applicant for license to practice medicine in this state shall be rejected because of his or her adherence to any particular school or theory of medicine. The public health council shall call to their assistance in the examination of any applicant who professes the homeopathic, ostopathic or electic school of medicine, a homeopathic, ostopathic or electic physician entitled to practice medicine in this state under this act, and such homeopathic, ostopathic, or electic physician so called to the assistance of the public health council, shall be allowed per diem and actual expenses incurred hereinbefore allowed the regular members of the public health council; provided, however, that the provisions of this and the preceding section shall not apply to physicians living in other states and duly qualified to practice medicine therein, who shall be called in consultation into this state, by a physician legally entitled to practice medicine in this state under this chapter, and provided, further, that the provisions of this chapter shall not apply to females practicing midwifery, or to commissioned officers of the United States army and navy and marine hospital service when in the actual discharge of their duties as such commissioned officers.

Sec. 10. ''Every person holding any such certificate, as is hereinbefore provided for, shall have the same recorded in the office of the secretary of the state board of health, in a book to be kept by him for that purpose, and the secretary shall endorse on said certificate, the fact of such recordation and deliver the same to the person named therein or to his order. The state board of health may refuse certificates to individuals guilty of malpractice or dishonorable conduct, and they may revoke certificates for like causes. Such revocation being after due notice and trial by the board of health, with right of appeal to the circuit court of the county in which such individual resides; but no such refusal or revocation shall be had or made by reason of the individual belonging to or practicing in any particular school or system of medicine.

Sec. 11. ''Every applicant for licensure after the first day of January, one thousand nine hundred and twenty-one, shall furnish prior to any examination

satisfactory proof to be passed upon by the state department of schools, that he has had a general education of not less than that given by a standard four-year high school course or its equivalent, and not less than one year of college credits in chemistry, biology and physics, all of which shall have been received before admission to medical study; provided, that the state department of schools may accept as satisfactory proof of preliminary education a certificate of premedical preliminary education from any state whose requirements are equal to those herein provided, in lieu of original school and college credentials, and shall pay to the public health council a fee of ten dollars, which fee shall not be returned to him if a certificate is refused him, but he may present himself for re-examination at any future examination, within a year, without the payment of any additional fee, and if a certificate be again refused him, he may as often as he sees fit thereafter, on the payment of a fee of ten dollars, be examined as herein provided, until he obtains such certificate.

All other persons who shall be granted a license to practice medicine in this state under the provisions of section nine of this chapter, shall pay a fee of not less than twenty-five dollars to the public health council.''

1.   The defendant relies mainly upon two propositions, the first of which is that the treatment administered to the persons named in the agreed statement of facts for which he received compensation, such treatment being the usual treatment given by chiropractors to relieve bodily infirmities and ailments, is not within the intent and meaning of the act requiring a license for the practice of medicine and surgery; that properly construed Sec. 8a, Chap. 150, Code 1923, defining the practice of medicine and surgery read in connection with sections 9, 10 and 11 of that chapter, relate to the relief of human ailments and infirmities by any method employed under the various theories of medicine and surgery mentioned in those sections; and fall within the rule of ejusdem generis; that these interpretative provisions of Sec. 8a are limited to practitioners of medicine and surgery and osteopathy, and the various schools of medicine in existence

at the date of the enactment thereof, and provided for in Sec. 9 of Chap. 150; and that therefore as the practice of chiropractic is not mentioned that method of treatment is excluded from the regulation of the statute; and consequently no license to defendant is required or provided for. Where general words follow an enumeration of persons or things of a particular and specific meaning, the general words must not be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned. This, in short, is the rule of *ejusdem generis* as applied in statutory construction. Black on Interpretation of Laws 141; Lewis' Sutherland Stat. Con. Vol. 2 (2nd Ed.) Sec. 437. A primary rule is that the legislative intent is found in the ordinary meaning of the words used; but if it be clear that the ordinary meaning be not intended by the context wherein specific words, descriptive of persons or things, are used, the ordinary meaning of general words will be restricted accordingly. Ejusdem generis means of the same kind, class or nature. Can this rule of interpretation be applied to the definition of the "practice of medicine and surgery" as used by Sec. 12, Acts 1915, (now in the Code as Sec. 8a, Chap. 150), so as to exclude the treatment of human ailments and infirmities as practiced by defendant? The Act of 1915 was, among other things, for the purpose of creating a state department of health, to change the name of the state board of health and limit and define its duties, *to amend the public health laws,* and provide penalties for violation, as shown by its title. In what particulars was there an amendment to the health laws? A brief summary of our statutes concerning public health may be helpful. In 1868 the statute relating to public health was very meagre in its scope, and extended to a prohibition, with penalties for violation, of a sale of any diseased, corrupt or unwholesome provision, whether meat or drink without making the same known to the buyer. Chapt. 150, Code 1868. In 1882 a state board of health was created, its duties defined and a method designated for examination and licensing of persons for the "practice of medicine", and provided penalties for practicing

unlawfully. The object of the act, among other things, was to regulate the practice of medicine and to protect the people against impiricism which is defined to be "a practice of medicine founded on mere experience without the aid of science or knowledge or principles." The examination embraced the general subjects of anatomy, physiology, chemistry, materia medica, pathology, pathological anatomy, surgery and obstetrics; and was to be sufficiently strict to test the qualifications of the applicant as a practitioner of medicine, surgery and obstetrics. Females practicing midwifery were exempt. The persons who were entitled to receive certificates to practice were graduates of a reputable college or school of medicine who presented diplomas, and upon presentation of which, certificates to practice were given; persons who had practiced continuously in the State for ten years prior to 1881; and such other persons who successfully passed the examination. The Act of 1882 continued in force with practically no change until 1907. The terms "practice of medicine" and "medical college" had a well defined meaning and were used by the act of 1882 in that sense. "Practice of medicine" refers to the calling or treating the sick by medical agencies as commonly practiced in the State at the time of the act; and "medical college" referred to those schools teaching medicine in its different branches where incipient doctors were instructed. An essential part of the teaching carried on in these institutions was the diagnosis of disease and the nature and effect of medicines and how to compound and administer them for relief. Surgery was an essential part and without technical knowledge no person was deemed competent to practice medicine or surgery. Various schools of medicine had arisen and were seeking favor from the public. The allopath adhered to that system which attempted to combat disease by the use of remedies which would produce effects different from those produced by the disease treated. The homeopath adhered to the theory that disease is cured by remedies which produce on a healthy person effects similar to the symptoms produced by the complaint with which the patient suffered, remedies being usually administered in

small doses. It is the opposite of allopathy. The eclectic school took its mode of practice from all schools. There were many other theories and subdivisions unnecessary to mention. Later the osteopath advanced another theory. This school was begun by Dr. Still at Kirksville, Mo., in 1871, and that theory of treatment has been recognized by the statute of 1907, and provisions made for examination and license. It will be observed that the Act of 1907 very materially changed the Act of 1882. The various general subjects of anatomy, physiology, chemistry, materia medica, &c., are not mentioned in the latter act. In lieu thereof general direction is given to the state board of health to hold examinations covering all the essential branches of the sciences of medicine and surgery, sufficient to test the knowledge and ability of the applicant, leaving a wide discretion in the conduct of the examination, and in the examination itself, to that distinguished body of men; but expressly providing that no applicant shall be rejected because of his or her adherence to any particular school or theory of medicine. Under that Act the license to an osteopath must state that it is for the practice of osteopathy and when issued should be deemed a license to practice osteopathy in all its branches. For the examination of those applicants who adhere to different schools and theories, the board is empowered to call to its assistance a licensed physician who adheres to the school to which an applicant might belong. Then, in 1915 we have the Act (now Sec. 8a, Chap. 150, Code) defining the "practice of medicine and surgery" to be as used in that act as "treatment of any human ailment or infirmity *by any method.*" And, "To open an office for such purpose or to announce to the public in any way a readiness to treat the sick or afflicted, shall be deemed to engage in the practice of medicine and surgery within the meaning of this act"; excepting registered optometrists.

With this rather lengthy resume of the statutes we are possibly more enabled to consider the application of the rule of *ejusdem generis* so earnestly relied upon by counsel for defendant. Interpretation of a statute is always aided by a consideration of the former legislation. The reasons which

induced the new act, the mischiefs intended to be remedied, the extraneous circumstances, and the purpose intended to be accomplished by it are to be considered. It is clear that no applicant for license to practice medicine and surgery shall be excluded from examination and from license by reason of his adherence to any particular school or theory of medicine. Then we have the broad and comprehensive definition of the practice of medicine and surgery enacted in 1915 after the osteopathic and chiropractic method of curing had come into existence and public notice. Its scope is too broad, its terms too explicit and the intention is too plain to allow it to be modified and restricted by the former legislation. The ejusdem generis rule of construction cannot be invoked. This rule always yields to the primary rule that an act should be so construed as to carry out the object sought to be accomplished so far as that object can be ascertained by the language employed. *Hawke* v. *Dunn,* 1 Q. B. (1897) 579. The mere fact that a school of medicine is not specifically mentioned does not in itself evidence an intention of the legislature to exclude it from the operation of the statute, if from a consideration of all its provisions the contrary clearly appears. The legislature cannot be expected to anticipate the founding of new methods of healing. It has by the enactment of this statute evidenced its intention to regulate the practice of all medicine and surgery. The question to be determined then is, does the practice of the chiropractor come within the definition of the practice of medicine and surgery as set out in Sec. 8a of the chapter? An excellent definition as to what constitutes the practice of medicine is contained in the opinion of the Massachusetts Supreme Court in the case of *State* v. *Zimmerman,* 221 Mass. 184, 108 N. E. 893, Anno. Cas. 1916-A, page 858, wherein the court in considering whether or not the practice of the chiropractic science came within the meaning of the practice of medicine. said:

"Medicine relates to the prevention, cure, and alleviation of disease, the repair of injury or treatment of abnormal or unusual states of the body and their restoration to a healthful condition. It includes a broad field. It is not confined to the administering

of medical substances, or the use of surgical or other
instruments. It comprehends 'a knowledge not only of
the functions of the organs of the human body, but
also of the diseases to which these organs are subject,
and of the laws of health and modes of living which
tend to avert or overcome disease, as well as of the
specific methods of treatment that are most effective
in promoting cures.' "

The weight of authority is to the effect that one who prac-
tices the chiropractic art or science comes within the provis-
ions of a statute regulating the practice of medicine. "It is
quite generally held that one who practices or attempts to
practice chiropractic treatment by adjusting or pretending
to adjust the spine of a person afflicted with bodily ailment
comes within a statute regulating the practice of medicine",
note on Chiropractic Treatment Am. & Eng. Anno Cases,
1913 C page 484 and cases there cited; note: L. R. A. 1917
C page 823; 21 R. C. L. Sec. 18, page 371; *Collins* v. *State of
Texas,* 223 U. S. 288. There are decisions to the contrary,
notably *State* v. *Biggs,* 133 N. C. 729 and *Nelson* v. *State
Board,* 22 Ky. L. Rep. 438, 50 L. R. A. 383. The Biggs case
and similar cases are criticized in *State* v. *Smith,* 33 L. R.
A. (N. S.) page 179. There can be no doubt but that under
the great weight of authority the defendant was practicing
medicine within the meaning of the statute.

2. Defendant further contends that if the statute be con-
strued to require him to pass an examination on the science
of medicine, drugs, and materia medica as recognized and
taught in class A medical schools, or on the methods or prac-
tices peculiar to surgery as therein taught in order that he
may lawfully practice his method of treatment of human ail-
ments and diseases; then the statute would be unconstitu-
tional and void as depriving defendant of the pursuit of a
lawful calling as a means of acquiring property and pur-
suing and obtaining happiness and safety, thereby con-
travening Sections 1 and 10, Art. III State Constitution
and Sec. 1, of the 14th Amendment to the Federal Consti-
tution, by depriving him of his privileges and immunities
and property without due process of law, and without equal

protection of the laws. It is undoubtedly true that the privilege of engaging in the practice of medicine is a valuable property right protected by our constitutional guarantees. But the preservation of public health by the sovereign power, is paramount to the exercise of the private privilege by the individual, and consequently the state has the inherent right by means of its police power to impose such reasonable restrictions upon the practice of medicine as are deemed necessary to attain the end in view, the preservation of public health. In the case of *Dent* v. *West Virginia*, 129 U. S. 114, the Supreme Court said:

> "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken. But there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the State for the protection of society. The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well of deception and fraud. As one means to this end it has been the practice of different States, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely, their possession being generally ascertained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction
>
> 98 W. Va.

on the subjects, scientific and otherwise, with which such pursuits have to deal. The nature and extent of the qualifications required must depend primarily upon the judgment of the State as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are unattainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation."

In discussing the terms "due process of law" in *Dent* v. *West Virginia, supra,* the Supreme Court said: "The great purpose of the requirement is to exclude everything that is arbitrary and capricious in legislation affecting the rights of the citizens. . . . . . . . There is nothing of an arbitrary character in the provisions of the statute in question; it applies to all physicians, except those who may be called for a special case from another state; it imposes no conditions which cannot be readily met; and it is made enforceable in the mode usual in kindred matters, that is, by regular proceedings adapted to the case . . . . . . . . . . . The law of West Virginia was intended to secure such skill and learning in the profession of medicine that the community might trust with confidence those receiving a license under authority of the State."

But the defendant contends that this statute is unconstitutional because it requires chiropractors to undergo examinations and take tests in branches of learning not included in the science of chiropractic, such as those pertaining to medicine, drugs and surgery, and that consequently it confers a monopoly of the treatment of medical diseases, ailments and infirmities upon those practicing according to the allopathic, homeopathic, eclectric and osteopathic methods. "In case the granting of a license is made conditional on the applicant's passing a satisfactory examination, the statute has been universally upheld and with little question, for naturally it is reasonable and proper to determine the skill and ability of a man by a direct examination of him. And it is reasonable to prescribe that all followers of the

healing art, no matter of what school, shall be subjected to a general examination, for no one is well qualified to deal with disease who does not understand disease, and so, though the only qualification that a Christian Science healer might claim to need is an ability to pray fervently and effectively, yet the safety of the people of the state may demand that such a healer be able to appreciate the nature and danger of the diseases with which he comes in contact.'' 21 R. C. L. Sec. 4, page 355. *In Board of Medical Examiners v. Blair*, 196, Pac. (Utah) 221, it was said: ''It is argued by appellant that the law requiring chiropractors to pass an examination in or have some knowledge of materia medica is so unreasonable as to render that requirement invalid; that, as the chiropractor does not use medicine, it is wholly useless for him to have a knowledge of medicine; that to require a knowledge of medicine by a chiropractor is as unnecessary as it would be to require that the medical doctor would have a thorough knowledge of geology or mineralogy. Even though the argument had merit, still it is one to be addressed to the Legislature. Should it be conceded that the contention renders doubtful the validity of the requirement that chiropractors have a knowledge of materia medica and some other subjects referred to in the statute, it would not render the law invalid, because when there is any reasonable doubt as to the validity of a statute the doubt must be resolved in favor of validity. It is only where the invalidity or unconstitutionality is clear and beyond cavil that the courts have the right to declare a law, or any part of the same, invalid.'' And in *Hicks* v. *State*, 227 S. W. (Tex.) page 304, the court held: ''It is not to be supposed that the Legislature would arbitrarily fix unreasonable limitations upon so vital a matter as the general requirements for examination, applicable alike to all who desire to engage in the high calling of the practice of medicine, but, on the contrary, we must presume that upon facts presented to the Legislature, which would show that chiropractors ought to be exempted from the provisions of Chapter 6, the laws would be so amended or changed as to effect that object. We have no right to judicially assume as to the facts which

were before the Legislature when it passed the law in question, whether same was urged by allopaths, homeopaths, osteopaths, optometrists, chiropractors, chiropodists, or ophthalmologists. The law as a law, appears to be made equally for all who fairly come within its comprehension, and as far as we know, prescribes no examination conforming to the technical requirements of any school or branch of medical practice, and is not violative of the tenets of article 16, sec. 31, of our Constitution, which commands laws prescribing the qualifications of physicians, and forbids preference by law to any school of medicine.'' In the case of *State* v. *Barnes,* 112 S. E. (S. C.) page 64, the court said: ''The main ground upon which the alleged capricious and unreasonable features of the act are urged, is that the chiropractor is required to familiarize himself with certain subjects which have no place in his branch of the healing art, such as anatomy, physiology, hygiene, toxicology, minor surgery, medical jurisprudence, pediatrics, bacteriology and pathology. Naturally the first step in the remedial process is diagnosis to find out what is the matter with the patient. To a laymen's view, a familiarity with most, if not all, of the subjects named, is essential to a proper discharge of this initial process, and equally so to the administration of the proposed remedy. Whether they are or not, however, is not a judicial question. It has been declared by the legislative authority, based we must assume, upon bona fide scientific grounds, and the requirement does not present such evidence of caprice or unreasonableness as to justify a destruction of a plan devised for the protection of the public.'' On this point see also *People* v. *Ratledge,* 156 Pac. (Cal.) 455.

The reasoning stated in these cases seems to us to be sound. It does not appear that defendant has ever applied for examination and license, or that he has been denied application.

Our conclusion is that defendant was engaged in the practice of medicine within the meaning of the statute; that the statute does not contravene any of the rights of the defendant guaranteed to him by our State and Federal Constitutions, and that as he failed to secure a license before engag-

ing in the practice of his profession, he was properly convicted in the court below.   The judgment will be affirmed.

*Affirmed.*