W. C. FARLEY, *etc.*

*v.*

PATRICK C. GRANEY, STATE ROAD COMMISSIONER, *etc.*

(CC 857)

Submitted September 21, 1960. Decided December 20, 1960.

HAYMOND, PRESIDENT, dissenting:

*J. Henry Francis, Jr., Lively, Light & Francis,* for plaintiff.

*Paul M. Cowgill, Jr., Philip G. Terrie,* for defendant.

CALHOUN, JUDGE:

In this declaratory judgment proceeding instituted in the Circuit Court of Kanawha County on March 25, 1960, the plaintiff, W. C. Farley, an individual doing business as Oak Hill Wrecking, seeks a declaration as to the construction and validity of Chapter 89, Acts of the Legislature, Regular Session, 1959, which amended Chapter 17 of the Code of 1931, by adding thereto a new provision designated as Article 23. The defendant, Patrick C. Graney, is the State Road Commissioner of West Virginia and as such official is charged with the administration of the statute.

Certain questions arising upon the defendant's demurrer to the plaintiff's petition have been certified by the trial court on its own motion to this Court, pursuant to 58-5-2, Code, 1931.

By its title it is stated that the act relates "to the establishment, maintenance, operation and licensing of junk yards; * * *". Section 1 contains the following definitions:

"'Junk' shall mean old or scrap copper, brass, rope, rags, batteries, paper, rubber, junked, dismantled or wrecked automobiles or parts thereof, iron, steel and other old or scrap ferrous or non-ferrous materials.

"'Junk yard' shall mean an establishment or place of business which is maintained or operated for the purpose of storing, keeping, buying or selling such junk, or for the maintenance or operation of an automobile graveyard.

"'Fence' shall mean an enclosure at least six feet in height so constructed and maintained as to obscure the junk in said enclosure from ordinary view to those persons passing upon the public highways in this state."

Other provisions of the act may be summarized as follows:

1. No such business shall be operated or maintained outside a municipality without a license.

2. If such business is commenced after January 1, 1959, it must be located at least 1000 feet from a primary highway. If it is maintained within 300 feet of a secondary highway, the view thereof from the highway must be obscured by natural objects or a fence.

3. If such business, as in the plaintiff's case, was maintained and operated prior to January 1, 1959, it must be maintained and operated more than 100 feet from any primary or secondary highway right of way with the view from such highway obscured by natural objects or a fence, but it may not be enlarged, expanded, or increased in size.

4. Required fences must be at least 6 feet in height, constructed and maintained so as to obscure the materials in the enclosures ''from ordinary view to those persons passing upon the public highways in this state'', must be kept in good order and repair, at all times painted, and no advertisement is permitted thereon other than the name of the licensee and the nature of the business.

5. Penalties are provided for violation of the act.

6. Though the statute became effective June 11, 1959, the provisions thereof were not enforceable until the first day of July, 1960.

In his petition for a declaratory judgment the plaintiff contends that the statute in question is unconstitutional and void in its entirety, or at least insofar as it applies to the plaintiff, in that it deprives him of life and liberty, with the means of acquiring and possessing his property and of pursuing and obtaining happiness and safety, in violation of Section 1 of Article III of the Constitution of West Virginia; that the statute takes and damages the plaintiff's property without

just compensation in violation of Section 9 of Article III of the Constitution of West Virginia; that the effect of the statute is to deprive the plaintiff of his property without due process of law, in violation of Section 10 of Article III of the Constitution of West Virginia and the Fourteenth Amendment of the Constitution of the United States; that it deprives the plaintiff of the equal protection of the law in contravention of the Fourteenth Amendment of the Constitution of the United States; and that the statute creates an unconstitutional delegation of legislative powers in violation of Section 1 of Article V of the Constitution of West Virginia.

The facts alleged in the petition are, for the purposes of the demurrer, taken as true. The plaintiff has been for the past eleven years engaged in the business of salvaging wrecked and disabled automobiles, rehabilitating those which can be rehabilitated, dismantling and using or selling used parts and equipment therefrom, and selling the remains to junk dealers for resale as scrap. In 1959 he had eight employees and did a gross business of $200,000.

In 1957 the plaintiff and his wife purchased a 9.29-acre tract of land near Oak Hill, Fayette County, for the sum of $6,000. This tract, on which plaintiff's business is operated, lies between the primary highway designated as U.S. Route 21-W. Va. Route 61 and the secondary highway known as Old U.S. Route 21, which is now designated as West Virginia Secondary Routes 15 and 20. According to a plat made a part of the petition, the widest portion of the tract between the two highways is approximately 345 feet; and if the 100-foot set-back provisions of Section 2 of the statute in question are applied to the tract from each of the two highways, it would leave for plaintiff's business use an area about 145 feet wide at it widest point and tapering sharply to a point about 500 feet to the southeast. The plaintiff has an office building and other small buildings located within the 100-foot area adjacent to the present U.S. Route 21. He alleges that

he has expended in improvements in excess of $10,000; that the cost of erecting the fences required by the statute will exceed the sum of $6,500; and that such portion of the tract as will remain after the set-back will be inadequate for the conduct of his business.

The three issues raised by the defendant's demurrer and the several questions certified may be summarized as follows: (1) Is the proceeding precluded under the provisions of Section 35 of Article VI of the Constitution of West Virginia, as a suit against the state? (2) Is this a controversy of such a nature that it may be determined in this declaratory judgment proceeding? (3) Does the statute in question violate Section 1, 9 or 10 of Article III of the Constitution of West Virginia; Section 1 of Article V of the Constitution of West Virginia; or the Fourteenth Amendment of the Constitution of the United States?

By an order entered on June 21, 1960, the trial court held that this proceeding does not constitute a suit against the state in contravention of Section 35 of Article VI of the Constitution of West Virginia, and that the controversy is one proper for determination in this declaratory judgment proceeding, thereby overruling the first and second points of the demurrer to the petition. Point three of the demurrer, dealing with the constitutionality of the statute, was sustained, but the constitutionality of the statute was upheld, ''except insofar as the set-back provisions * * * may destroy the business and use of the premises of plaintiff to the extent alleged in the petition herein, * * *.''

Counsel for the defendant now concedes that under the authority of *Douglass v. Koontz,* 137 W. Va. 345, 71 S. E. 2d 319, this proceeding is merely one for a declaratory judgment construing the statute in question and is not a suit against the state. The second point of the syllabus of that case is as follows: ''A suit against the state tax commissioner for a declaratory judgment to determine whether the Business and Occupation Tax, imposed by Chapter 11, Article 13,

as amended, is applicable to a given state of facts, which suit seeks only to construe the statute and direct the parties, is not a suit against the State within the provisions of Article VI, Section 35 of the Constitution of West Virginia."

In asserting that at the time of the institution of this proceeding on March 25, 1960, there did not exist a controversy of such a nature as to be cognizable in a declaratory judgment proceeding, the defendant refers to the fact that, though the statute now in controversy became effective on June 11, 1959, by the express terms thereof its provisions were not *"enforceable until and after"* July 1, 1960. The pertinent allegations of the petition are as follows:

> "Plaintiff, through his duly authorized representative, has urged and requested defendant to waive the provisions of Sections 2 and 4 of said statute as the same apply to plaintiff and his business, but defendant has refused to do so and continues in his intention not to do so, maintaining that the said statute is constitutional and valid and is applicable to plaintiff and his business and that plaintiff must meet the requirements of said statute and obtain the license for the conduct of his business required thereby on or before the effective date of the statute.

> "Plaintiff further represents and says that the matters and things herein set forth and a settlement of the controversy between the parties hereto are of great urgency, requiring speedy determination, for unless decision as to the validity and the construction of Chapter 89 of the Acts of the Legislature, Regular Session, 1959, is obtained on or before the enforceable date thereof plaintiff, and other persons similarly situated, will be forced to expend great sums of money in order to meet the requirements thereof, or to discontinue and abandon the conduct of their business until said questions are determined, at a great cost and loss to plaintiff and each of the other persons so similarly situated."

By Chapter 26, Acts of the Legislature, Regular Session, 1941, Chapter 55 of the Code, 1931, was amended by inserting therein a new provision designated as Article 13, known as the Uniform Declaratory

Judgments Act. Section 1 provides that courts of record shall have "power to declare rights, status and other legal relations whether or not further relief is or could be claimed." Section 2 provides: "Any person * * * whose rights, status, or other legal relations are affected by a statute, * * * may have determined any question of construction or validity arising under the * * * statute, * * * and obtain a declaration of rights, status or other legal relations thereunder." Section 3 provides: "A contract may be construed either before or after there has been a breach thereof." By Section 5 it is provided that the enumeration contained in the statute "does not limit or restrict the exercise of the general powers conferred in section one, in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy" giving rise to the proceeding. Section 12 provides: "This act is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered."

In the case of *Crank v. McLaughlin,* 125 W. Va. 126, 23 S. E. 2d 56, the newly-enacted statute was first construed by this Court. In the single syllabus point of that case, it is stated that under its provisions courts may enter judgments or decrees declaratory of the law, in cases of "actual and existing controversies." The spirit of the statute is exemplified by Section 3, which provides that a contract may be construed *before* a breach thereof.

In *Board of Education of Wyoming County v. Board of Public Works,* 144 W. Va. 593, 109 S. E. 2d 552, 556, the Court stated: "The purpose of a declaratory judgment proceeding, however, is to anticipate the actual accrual of causes for equitable relief or rights of action by anticipatory orders which adjudicate real controversies before violation or breach results in loss to one or the other of the persons involved." It is true that the courts will not in such a proceeding

adjudicate rights which are merely contingent or dependent upon contingent events, as distinguished from actual controversies. *Town of South Charleston v. Board of Education of Kanawha County,* 132 W. Va. 77, 50 S. E. 2d 880. Nor will courts resolve mere academic disputes or moot questions or render mere advisory opinions which are unrelated to actual controversies. *Mainella v. Board of Trustees,* 126 W. Va. 183, 27 S. E. 2d 486. 26 C.J.S., Declaratory Judgments, Section 30, page 107.

The constitutionality of a statute may be determined in a declaratory judgment proceeding if an actual controversy exists relative to the rights of the parties thereunder. *Board of Education of Wyoming Co. v. Board of Public Works,* 144 W. Va. 593, 109 S. E. 2d 552. Statutes may be construed before or after breach at the petition of a properly interested party. "So, a plaintiff is not required to violate a penal statute as a condition of having it construed in a proceeding for a declaratory judgment." 26 C.J.S., Declaratory Judgments, Section 45, page 129.

The controversy between the plaintiff and the defendant is actual, existing and justiciable in the sense that the defendant has made evident his purpose to enforce provisions of the statute and that such enforcement will directly and materially affect the rights of the plaintiff. At the time of the institution of this proceeding the statute in question was in effect. It is true that under the provisions thereof the plaintiff was given until July 1, 1960, to make such changes as were necessary in order to cause his business and his property to conform to the requirements of the statute. Meantime the statute was effective in the sense that the plaintiff was forbidden thereby to make any changes in or use of his property except in conformity with the legislative enactment. The controversy was actual, existing and justiciable in that the unconstitutionality of the statute, designed to have a material effect on the plaintiff's property rights, was asserted by the plaintiff and denied by the defendant.

It would not be consonant with the spirit, intent and purpose of the declaratory judgment statutes to have required the plaintiff to wait until the July 1, 1960, deadline, then to violate the statute and to be arrested in order to have a determination of his rights, duties and responsibilities under the statute. Only in a limited sense can it be said that the plaintiff has sought herein a declaratory judgment before the statute became effective. Only the enforcement provisions were in abeyance at the time this proceeding was commenced.

Authorities are divided on the question whether a declaratory judgment proceeding to construe a statute or ordinance or to determine its constitutionality may be maintained prior to the effective date of such statute or ordinance. Persuasive is the opinion in the case of *Pierce, Governor of Oregon, et al. v. Society of Sisters,* and a companion case, 268 U.S. 510, 45 Sup. Ct. 571, 69 L. ed. 1070, wherein, before the effective date of a statute, the court in injunction proceedings determined the unconstitutionality of the statute and enjoined its enforcement. In the case of *Hoagland v. Bibb,* 12 Ill. App. 2d 298, 139 N.E. 2d 417 at page 420, the court stated: ''A declaratory judgment action will lie to determine rights under a statute even though the act is not yet in effect. Anderson on Declaratory Judgments Section 291 page 676, Acme Finance Co. v. Huse, 192 Wash. 96, 73 P. 2d 341, 114 A.L.R. 1345 and annotation following report of case in 114 A.L.R. 1365; Department of Financial Institutions v. General Finance Corp., 227 Ind. 373, 86 N.E. 2d 444, 10 A.L.R. 2d 436. The amendatory act was certain to take effect. In the absence of an adjudication declaring its invalidity, it is to be presumed that those officials charged with its enforcement will do their duty and enforce it. If, as alleged, such enforcement will substantially affect plaintiffs' property rights, a declaration may be sought before the legislation becomes effective.'' See also *Tietjens v. City of St. Louis,* 359 Mo. 439, 222 S. W. 2d 70; *Ostrander v. Linn,* 237 Iowa 694, 22 N.W. 2d 223; *State v. Shanahan,* 178 Kan. 400,

286 P. 2d 742; *Maguire v. Monaghan*, 134 N.Y.S. 2d 320, 206 Misc. 550, affirmed 139 N.Y.S. 2d 883, 285 App. Div. 926; *Hyde Park Dairies v. City of Newton*, 167 Kan. 730, 208 P. 2d 221.

For the reasons stated above, the Court is of the opinion that the controversy disclosed by the pleadings is of such nature and character as to be proper for determination in this declaratory judgment proceeding.

The basic contention made in behalf of the plaintiff on the question of constitutionality is that the statute is based solely on esthetic considerations, and therefore is not justified under the police power. As a preliminary to a discussion of the precise question of constitutionality, we undertake a brief reference to principles by which a court must be guided in determining the constitutionality of a legislative enactment.

Section 1 of Article V of the Constitution of West Virginia provides that the three branches of government "shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others". While the Supreme Court of the United States, in the absence of a specific authorization in the Constitution, determined merely by judicial construction its right to declare unconstitutional an act of Congress or of a state legislature, this Court is specifically authorized to determine "the constitutionality of a law." Article VIII, Section 3, of the Constitution of West Virginia. This Court has, nevertheless, displayed its zeal to hold within restricted limits this area of judicial supremacy in the state government, and has stated the obvious fact that one branch of the government can not encroach on the domain of another without danger. *Nulter v. State Road Commission*, 119 W. Va. 312, 317, 193 S. E. 549, 551.

In pursuance of its purpose to observe scrupulously the constitutional mandate that the several branches of state government must remain separate in practice as well as in theory, the Court has formulated and perpetuated certain fundamental rules which must be

adhered to in the performance of the delicate task of determining the constitutionality of an act of the legislature. In the early case of *Osburn et al. v. Staley, et al.,* 5 W. Va. 85, the Court pointed out the presumption in favor of the constitutionality of a legislative enactment; that if a statute can be construed so as to avoid a conflict with the Constitution, such construction will be adopted by the courts; and that courts can not declare an act of the legislature invalid "unless its invalidity is placed, in their judgment, *beyond reasonable doubt.*" (Italics supplied). Similar principles were restated by the Court in the recent case of *Board of Education of Wyoming County v. Board of Public Works,* 144 W. Va. 593, 109 S. E. 2d 553 at pages 559-60:

> "* * * When a statute is susceptible of two constructions, one of which is, and the other of which is not, violative of a constitutional provision, the statute will be given that construction which sustains its constitutionality unless it is plain that the other construction is required.

> \*     \*     \*

> "The principle is also firmly established that any doubt as to the constitutionality of an act of the Legislature will always be resolved in favor of the validity of the statute. * * *In passing upon the validity of a statute which is challenged as violative of the Constitution of this State, every reasonable construction will be resorted to by the Court to sustain its constitutionality. * * *"

The Court has carefully noted the supremacy of the legislature in its own field:

> "In resolving the question of the constitutionality of an act of the Legislature * * *, two controlling principles must be kept in mind. The first of these principles is that the power of the legislative department * * * is subject only to the limitations imposed by the State and Federal Constitutions. State v. Woodward, 68 W. Va. 66, 69 S. E. 385, 30 L.R.A.N.S., 1004. The test of legislative power in this State is constitutional restriction. That which the Constitution of this State does not prohibit the Legislature from doing, and which does not violate the

Constitution of the United States, the Legislature may do  Harbert v. Harrison County Court, 129 W. Va. 54, 39 S. E. 2d 177; State Road Commission v. County Court, 112 W. Va. 98, 163 S.E. 815. The power of the Legislature of a State is an attribute of sovereignty and its power would be absolute if there were no constitutional limitations. Howard v. Ferguson, 116 W. Va. 362, 180 S. E. 529. The other principle is that any doubt as to the constitutionality of an act of the Legislature will always be resolved in favor of the validity of the statute. State v. See, W. Va., 42 S. E. 2d 31; State v. Furr, 101 W. Va. 178, 132 S. E. 504." *State v. Harrison*, 130 W. Va. 246, 43 S. E. 2d 214.

"This Court has held that the general powers of the Legislature are almost plenary and that it can legislate on every subject not interdicted by the Constitution itself. The test of legislative power in this State is constitutional restriction, and what the people have not said in the organic law their representatives shall not do, they may do. State Road Commission v. County Court, 112 W. Va. 98, 163 S. E. 815; State ex rel. Thompson v. McAllister, 38 W. Va. 485, 18 S. E. 770, 24 L.R.A. 343; State v. Dent, 25 W. Va. 1. In the case of Howard v. Ferguson, 116 W. Va. 362, 180 S. E. 529, 532, this Court used this appropriate and clearly applicable language: 'The authority of a state legislature is of the essence of ,sovereignty; it would be absolute but for constitutional limitations. * * *.' " *Harbert v. County Court of Harrison County*, 129 W. Va. 54, 39 S.E. 2d 177.

"* * * Unfortunately, a definite criterion of reasonableness has not yet been formulated. If a statute is within the legitimate range of the police power, has a fair tendency to accomplish the end proposed, is not unjustly discriminative, and does not destroy nor despoil a particular class, courts should not declare it unreasonable merely because they consider it impolitic or because it will operate harshly upon some individuals. The necessity for the statute and the manner of its enforcement are fundamentally legislative, not judicial, questions. Missouri P. Ry. Co. v. Humes, 115 U.S. 512, 520, 6 S. Ct. 110, 29 L. Ed. 463; Sligh v. Kirkwood, 237 U.S. 52, 61, 35 S. Ct. 501, 59 L. Ed. 835; Standard Oil Co. v. Marysville, 279 U. S. 582, 584, 49 S. Ct. 430, 73 L. Ed. 856; Hiller v. State, 124 Md. 385, 92 A. 842; Shea v. Ellenstein, 118 N.J.L. 438, 193 A. 551. Every reasonable presump-

tion must be indulged in favor of the validity of a statute, 'and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule.' Sinking Fund Cases, 99 U.S. 700, 718, 25 L. Ed. 496. Accord, State Road Comm. v. County Court, 112 W. Va. 98, 102, 163 S. E. 815." *Nulter v. State Road Commission of West Virginia,* 119 W. Va. 312, 193 S. E. 549.

The police power is difficult to define because it is so extensive, elastic and constantly expanding in its scope to meet the new and increasing demands for its exercise for the benefit of society. *Weber City Sanitation Co. v. Craft,* 196 Va. 1140, 1152, 87 S. E. 2d 153, 160. It embraces the power of the state to preserve and promote the public welfare and it is concerned with whatever affects the peace, security, morals and general welfare of the community. *W. Va. Water Service Co. v. Cunningham,* 143 W. Va. 1, 98 S. E. 2d 891. For exhaustive definitions in other recent decisions of this Court, see *Quesenberry v. Estep,* 142 W. Va. 426, 95 S. E. 2d 832; *State v. Chambers,* 138 W. Va. 701, 77 S. E. 2d 297; *City of Huntington v. State Water Commission,* 137 W. Va. 786, 73 S.E. 2d 833; *State v. W. Va. Racing Commission,* 133 W. Va. 179, 55 S. E. 2d 263; *Carter v. City of Bluefield,* 132 W. Va. 881, 54 S. E. 2d 747. ''The police power of a state, in a comprehensive sense, embraces its whole system of internal regulation by which the state may subject persons and property to all kinds of reasonable restraints and burdens in order to secure the general comfort, health and prosperity of the state, to preserve public order, prevent offenses, and to establish for the intercourse of citizens with citizens those rules of good conduct and good neighborhood which are calculated to prevent a conflict of rights and to insure to each the uninterrupted enjoyment of his own rights so far as is reasonably consistent with a like enjoyment of rights by others. In the police power, which cannot be surrendered, or defined with circumstantial pre-

cision, but which, except as restrained by constitutional inhibition, is unlimited, is found the inexhaustible source of those new legislative regulations which in response to the needs of a progressive civilization are designed to promote the public convenience and general prosperity. It is said that the police power is coeval with government, * * *." 4 M. J., Constitutional Law, Section 66, pages 158-9.

The exercise of the police power cannot be circumscribed within narrow limits nor can it be confirmed to precedents resting on conditions of the past. As civilization becomes more complex and advancements are made the police power of necessity must develop and expand to meet such conditions. *Weber City Sanitation Comm. v. Craft,* 196 Va. 1140, 87 S. E. 2d 153. "The police power is not susceptible of circumstantial precision because it is impossible to foresee changing conditions which may call for its exercise. City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 184 N.W. 823, 23 A.L.R. 1322." *Cavalier Vending Corp. v. State Board of Pharmacy,* 195 Va. 626, 632, 79 S. E. 2d 636, 640. In holding that slum-clearance and low-cost housing legislation is within the police power, in the case of *Chapman v. Huntington, W. Va., Housing Authority,* 121 W. Va. 319, 331, 3 S. E. 2d 502, 508, the Court, speaking of the police power, stated: "Of course, the conception of a public purpose must expand within constitutional limits with the broadening of the functions of government and the growth of the country." "Such power is not confined to the physical welfare of the public, but includes the general intellectual and moral well-being and development; it extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community." 16 C.J.S., Constitutional Law, Section 175, page 903. "It may be said in a general way that the police power extends to all the great public needs. Camfield v. United States, 167 U.S. 518, [17 S. Ct. 864, 42 L. Ed. 260.] It may be put forth in aid of what is sanctioned by usage,

or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." *Noble Bank v. Haskell,* 219 U.S. 104, 31 S. Ct. 186, 55 L. ed, 112, 32 L.R.A. (N.S.) 1062, Ann. Cas. 1912A, 487. See also *Gorieb v. Fox,* 145 Va. 554, 134 S. E. 914, affirmed in 274 U.S. 603, 47 S. Ct. 675, 71 L. ed. 1228, 53 A.L.R. 1210. 'Whether in any given case the general welfare calls for particular legislation is a question primarily for the legislature; and the courts will not ordinarily interfere therewith, unless, after every allowance is made, the legislature has been found to have exceeded its powers or no sufficient basis for such exercise can be found. The legislature is also vested with a large discretion in respect of the means necessary to promote the general welfare." 16 C.J.S., Constitutional Law, Section 198, at page 968.

When the legislature has authority under the police power, the reasons by which it is influenced in exercising such power can not be inquired into by the courts. If the legislature has the power, it has a wide latitude in determining the need for its exercise and the extent thereof. "The test of valid legislation is legislative power, not inducement." *Nulter v. State Road Commission,* 119 W. Va. 312, pt. 1 syl., 193 S. E. 549. See also *Chapman v. Huntington, W. Va., Housing Authority,* 121 W. Va. 319, pt. 15 syl., 3 S. E. 2d 502. "The expediency or inexpediency of an act in question is a question for the Legislature and not the courts." *Slack v. Jacob,* 8 W. Va. 612, pt. 6 syl. See also *State v. Peel Splint Co.,* 36 W. Va. 802, 15 S. E. 1000, 17 L.R.A. 385. For an excellent discussion of the police power, see the dissenting opinion of Judge Given in the case of *State v. Memorial Gardens,* 143 W. Va. 194, 101 S. E. 2d 432. The authorities are legion to the effect that it is not the province of the courts, nor within their power, to pass judgment on the exercise of the legislative discretion and prerogative in determining the need for or the wisdom of legislation enacted in pursuance of the police power. 4 M. J., Constitutional Law, Sec-

38

tion 55, pages 142-146; 5 West's Digest, Va. and W. Va., Constitutional Law, Section 70(3), page 194.

In brief the police power is an inherent attribute of sovereignty, existing independently of a constitutional grant thereof. In general terms it may be said that it is as broad and comprehensive as the demands of society for its exercise. It is not static, but it is capable of evolving within constitutional limits to meet the demands or needs of an increasingly dense population and an increasingly complex society. Its scope is not to be determined on the basis of precedent alone, for there may be no precise precedent for the needs or demands of a given time; but such needs or demands also may furnish a measure of its scope. It is fortunate for this nation that Justice John Marshall was not required to find support in precedent for the momentous decisions which breathed the breath of life into the infant nation and caused it to take shape and stand erect in its magnificent, mature form. The greatness of the Constitution he so ably interpreted lies, in a great measure, in the fact that its provisions are of such flexible nature as to permit the development and evolvement of the nation in a manner and to a degree which bespeak the wisdom of the men whose brains conceived it and whose patient labors gave it birth.

While various constitutional questions have been urged in behalf of the plaintiff, their solution, in a great measure at least, depends on a determination whether the legislative enactment under consideration falls properly within the police power, and whether such power has been exercised arbitrarily or unreasonably. We must bear in mind that the plaintiff's property has not been "taken", nor has his business been prohibited. The plaintiff still has his property and he may make a restricted use of it in his junk business, he may devote it to other uses, or he may engage in the junk business at a different location. The authorities listed below deal with other constitutional questions raised in behalf of the defendant, and, we believe, furnish answers to such questions. In the interest of

brevity, they are not referred to in detail. *Huntington v. State Water Commission*, 137 W. Va. 786, syl. 3, 73 S. E. 2d 833. For other aspects of the question of constitutionality, see *Laing v. Fox*, 115 W. Va. 272, 175 S. E. 354; *Chapman v. Huntington, W. Va., Housing Authority*, 121 W. Va. 319, 3 S. E. 2d 502; *Nulter v. State Road Commission*, 119 W. Va. 312, 193 S. E. 549; *State v. Morrison*, 98 W. Va. 289, 127 S. E. 75; *Gorieb v. Fox*, 145 Va. 554, 134 S. E. 914; *Mill Creek Coal & Coke Co. v. Public Service Commission*, 84 W. Va. 662, 100 S. E. 557, 7 A.L.R. 1081; *Burdett v. Allen*, 35 W. Va. 347, 13 S. E. 1012; *Weber City Sanitation Commission v. Craft*, 196 Va. 1140, 87 S. E. 2d 153; *West Bros. Brick Co. v. Alexandria*, 169 Va. 271, 192 S. E. 881; *Finney v. Hawkins*, 189 Va. 878, 54 S. E. 2d 872; *Miller v. State Etomologist*, 146 Va. 175, 135 S. E. 813, 67 A. L. R. 197; 4 M. J., Constitutional Law, Sections 80 and 81, pages 174-79; *Nebbia v. People of the State of N. Y.*, 291 U.S. 502, 54 S. Ct. 505, 78 L. ed. 940; *Breard v. City of Alexandria*, 341 U.S. 622, 71 S. Ct. 920, 95 L. ed. 1233, 35 A. L. R. 2d 335; 16 C. J. S., Constitutional Law, Section 209, pages 1048-65; *State v. City of New Orleans*, 154 La. 271, 97 So. 440.

As has been stated previously, it is insisted in behalf of the plaintiff that the legislative enactment obviously is predicated solely on esthetic considerations; that the police power will not justify legislation based purely on esthetic considerations; and that, therefore, the legislative enactment is unconstitutional and void. We commence a consideration of this proposition by a frank acknowledgment that it presents a difficult question. It would serve no useful purpose to engage in an extended discussion of the place of esthetic considerations in the enactment of legislation under the police power. It can not be gainsaid that at this time the great weight of authority is to the effect that esthetic considerations *alone* will not justify the exercise of legislative authority under the police power. But on the other hand, it is perhaps just as well established that esthetic considerations may be given due

40

weight in connection with other factors which suppor[t]
legislative exercise of the police power. It is clear als[o]
that there is in this day a marked tendency to accor[d]
greater importance to esthetic considerations. Court[s]
have frequently been at pains to assign other base[s]
for the validity of legislation when obviously the leg[-]
islation being considered has been predicated predom[-]
inately on esthetic considerations. 11 Am. Jur., Con[-]
stitutional Law, Section 280, page 1038; *State v. Kiev*[-]
*man,* 116 Conn. 458, 165 A. 601; 62 C. J. S., Municipa[l]
Corporations, Section 226(6), page 437; *State v. City*
*of New Orleans,* 154 La. 271, 97 So. 440.

In the case of *West Bros. Brick Co. v. City of Alex*[-]
*andria,* 169 Va. 271, 192 S. E. 881, involving the righ[t]
to operate a brickyard in an area reserved for resi[-]
dential purposes, the Court stated:

> "Aesthetic considerations alone are not enough but
> they should be considered.
>
> " 'It seems to us that aesthetic considerations are rel-
> ative in their nature. With the passing of time, social
> standards conform to new ideals. As a race, our sen-
> sibilities are becoming more refined, and that which
> formerly did not offend cannot now be endured. That
> which the common law did not condemn as a nuisance
> is now frequently outlawed as such by the written
> law. This is not because the subject outlawed is of
> a different nature, but because our sensibilities have
> become more refined and our ideals more exacting.
> Nauseous smells have always come under the ban of
> the law, but ugly sights and discordant surroundings
> may be just as distressing to keener sensibilities. The
> rights of property should not be sacrificed to the
> pleasure of an ultra-aesthetic taste. But whether they
> should be permitted to plague the average or dom-
> inant human sensibilities well may be pondered.'
> State ex rel. Carter v. Harper, 182 Wis. 148, 158, 196
> N.W. 451, 455, 33 A.L.R. 269. It might be hard to
> prove that a city dump was hurtful to health, but
> plainly it should not be located in a residential dis-
> trict. The days of kitchen middenz are gone. * * *
>
> "All of these considerations address themselves pri-
> marily to the Legislature (city council), and its judg-
> ment stands unless there has been plain abuse of its
> wide discretion."

In *General Outdoor Advertising Co. v. City of Indianapolis*, 202 Ind. 85, 172 N.E. 309, at page 312, the court stated: "Under a liberalized construction of the general welfare purposes of state and Federal Constitutions there is a trend in the modern decisions (which we approve) to foster, under the police power, an aesthetic and cultural side of municipal development—to prevent a thing that offends the sense of sight in the same manner as a thing that offends the senses of hearing and smelling. 3 McQuillen, Mun. Corps (2d) 1049; Ware v. Wichita, 113 Kan. 153, 157, 214 P. 99; State ex rel. Civello v. New Orleans (1923) 154 La. 271, 97 So. 440, 33 A. L. R. 260; State ex rel. Carter v. Harper (1923) 182 Wis. 148, 158, 196 N.W. 451, 33 A.L.R. 269; Cochran v. Preston (1908) 108 Md. 220, 70 A. 113, 23 L.R.A. (N.S.) 1163, 129 Am. St. Rep. 432, 15 Ann. Cas. 1048."

> "* * * Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S. Ct. 114, 71 L. ed. 303.

In the recent case of *Berman v. Parker*, 348 U.S. 26, 33, 75 S. Ct. 98, 101-2, 99 L. ed. 27, involving the District of Columbia Redevelopment Act of 1940, the Supreme Court of the United States stated: "We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. See Day-Brite Lighting, Inc. v.

42

State of Missouri, 342 U.S. 421, 424, 72 S. Ct. 405, 407, 96 L. Ed. 469. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way." See also 16 C.J.S., Constitutional Law, Section 195, pages 938-40.

Turning now to previous decisions of this Court, in *Snyder v. Cabell*, 29 W. Va. 48, 1 S. E. 241, occupants of dwelling houses sought to enjoin the defendants from operating a skating rink near the residences of the plaintiffs. The trial court dismissed the bill, but this Court reinstated the original temporary injunction and made it perpetual. The Court in its opinion stated: "* * * We base the propriety of the injunction on the noise alone." The fifth point of the syllabus is as follows: "Where the prosecution of a business in itself lawful in the neighborhood of a dwelling-house renders the occupation of it materially uncomfortable by noises alone, the carrying on of such business, while it produces such results, will be restrained by a court of equity."

In *Ritz v. The Woman's Club of Charleston*, 114 W. Va. 675, 173 S. E. 564, this Court affirmed a decree of the Circuit Court of Kanawha County finding that dances conducted at the club house of the defendant in a residential district of the city were a nuisance and enjoining their continuation after nine o'clock at night. The first point of the syllabus states: "Noise alone may create a nuisance, depending on time, locality and degree."

In the case of *Fruth v. Board of Affairs*, 75 W. Va. 456, 84 S. E. 105, involving the establishment by municipal ordinance of building lines adjacent to streets of the City of Charleston, the Court stated: "Our conclusion is, that *under the present status of the law, and considering the present conditions as to population* existing in the cities of our state, we should not go counter to the great weight of authority and take advanced ground on the question of the police power to regulate and control the use of private property, based on mere aesthetic ground and having no reasonable reference to the safety, health, morals and general welfare of the people at large." (Italics supplied.) The case of *State v. Stahlman*, 81 W. Va. 335, 94 S. E. 497, involved an ordinance of the City of Bluefield, regulating the height of buildings in the business section of the city, and in that connection the Court stated in the fifth point of the syllabus that such a regulation could not be applied "to effect symmetry or ornamentation of a city, street or section, * * *." See also *State v. Nunley, Mayor, and City Council of the City of Montgomery*, 94 W. Va. 189, 117 S. E. 888. Since the decisions referred to immediately above, however, this Court, following the precedent of *Village of Euclid, v. Ambler Realty Co.*, 272 U.S. 365, 47 S. Ct. 114, 71 L. ed. 303, 54 A. L. R. 1016, has upheld a municipal zoning ordinance enacted pursuant to a legislative delegation of police power. *Carter v. City of Bluefield*, 132 W. Va. 881, 54 S. E. 2d 747. It is to this case, therefore, rather than to the earlier decisions of this Court, that we look for such guidance as it may furnish to us in the case now under consideration.

The case of *Carter v. City of Bluefield, supra*, upholding the validity of a zoning ordinance enacted under the police power, was decided in 1949. In 1937 there was before the Court the case of *Parkersburg Builders Material Co. v. Barrack*, 118 W. Va. 608, 191 S. E. 368, 110 A.L.R. 1461, involving a suit in equity to enjoin the defendant from using his property within the City of Parkersburg for "outdoor storage and

wreckage of abandoned automobiles''. From the opinion it appears that the defendant's business being conducted on the property was a junk yard and automobile graveyard. The opinion was written by Judge Maxwell, who for years was an able and respected member of this Court. The entire opinion is believed to be pertinent to the case now before us, and only in the interest of brevity do we resist the urge to quote it herein almost in its entirety and especially so because of the position of honor and respect which Judge Maxwell established for himself as a member of this Court. A portion of the opinion is as follows:

> "Truly, in our complex American society where congestion is yearly becoming more pronounced, the changing conditions of this progressive nation require an expanding application of basic principles. The modern tendency to yield to such expansion is clearly illustrated in recent holdings of our highest court giving enlarged meaning to certain provisions of our organic law deemed to be necessary to meet changing conditions in our national life. Therefore, we need not shirk our responsibility in matters of this character when necessity for action is made clear on impelling grounds of public good, even though the result be attained through liberalization of hitherto accepted restrictions respecting the safety, peace, morals and general welfare of the people. Evincing this fundamental truth is the circumstance that in some states where zoning ordinances were at first declared unconstitutional, later decisions have upheld them. See reference in *Euclid* case, *supra*, at p. 391 of 272 U.S.

> "But evolutional conceptions respecting the right and duty of society to protect itself from undesirable and disagreeable conditions are not of necessity confined to municipal zoning ordinances. There is a growing belief that that which is offensive to the view, an eye-sore, a landscape-blight, may attain such significance as to warrant equitable interposition. In *Yeager v. Traylor*, 306 Pa. 530, 160 A. 108, neighboring property owners sought to enjoin the erection of a public storage garage which was to have open sides and parking space on the roof. The court permitted the building to be erected but required that it be en-

tirely enclosed, and stated further, 'If it is proposed to supply parking space upon the roof an effective screen must be provided by means of a suitable balustrade or other device to hide the unsightly appearance which would be the result of such practice.' * * *

"Happily, the day has arrived when persons may entertain appreciation of the aesthetic and be heard in equity in vindication of their love of the beautiful, without becoming objects of opprobrium. Basically, this is because a thing visually offensive may seriously affect the residents of a community in the reasonable enjoyment of their homes, and may produce a decided reduction in property values. Courts must not be indifferent to the truth that within essential limitations aesthetics has a proper place in the community affairs of modern society.

* * *

"Where, however, a section of a municipality is not a clearly established residential community a court of equity will not be warranted in excluding therefrom as a nuisance an automobile-wrecking business merely on the ground of unsightliness. Such, in our opinion, is the situation at bar."

Judge Kenna wrote a concurring opinion. The basis thereof seems to have been his belief that considerations of unsightliness or esthetics should be left to the legislature in the exercise of the police power and that the Court was without authority independently of legislative enactments to exercise the police power in the equity suit to enjoin a nuisance. Judge Kenna stated: at page 615 of the opinion (192 S. E. 292): "There is to my mind a clear and most decided difference between direct control by the courts through the process of injunction on the one hand, and the control exercised by the legislative branch through the use of the police power on the other."

The case of *Martin v. Williams*, 141 W. Va. 595, 93 S. E. 2d 835, involved a suit in equity to enjoin as a nuisance the operation by the defendant of a "used car sale business" near the corporate limits of the City of Bluefield. In the opinion the Court quotes at length from the case of *Parkersburg Builders Material*

46

*Co. v. Barrack, supra,* and refers to it as the "latest decision of this Court upon the question" presented for decision. The first point of the syllabus is as follows: "The establishment of what is commonly known as a 'used car lot' *with its incident noise, light, unsightliness and resultant depreciation of adjoining residential property values* in an area, which, though unrestricted and without the corporate limits of a town or city, was across a highway from zoned residential property lying within the corporate limits, and which area had previously been exclusively residential on both sides of the highway for a distance of approximately one-fourth of a mile, and which 'used car lot' greatly *interferes with the use, comfort and enjoyment of such surrounding residential properties,* constitutes a nuisance in fact, and may be abated by a court of equity." (Italics supplied.)

By way of summary of the prior pertinent decisions of this Court, we note from *Snyder v. Cabell, supra,* and *Ritz v. The Woman's Club of Charleston, supra,* that "noise alone" may create a nuisance cognizable by a court of equity. Perhaps it is not without basis to assert that *Fruth v. Board of Affairs, supra,* dealing with municipal building lines and *State v. Stahlman, supra,* dealing with muncipal regulation of the height of buildings in business districts, have been superseded and outmoded, in some measure at least, by *Village of Euclid v. Ambler Realty Co.,* and *Carter v. City of Bluefield, supra,* which upheld the validity of zoning ordinances. We note also that *Parkersburg Builders Material Co. v. Barrack, supra,* is a precedent for the proposition that *"persons may entertain appreciation of the aesthetic and be heard in equity in vindication of their love of the beautiful"* because "a thing visually offensive may seriously affect the residents of a community in the *reasonable enjoyment of their homes* and may produce *a decided reduction in* property values." (Italics supplied.) We note that in *Martin v. Williams, supra,* the Court in enjoining a used car lot as a nuisance, considered *"its incident noise, light, un-*

*sightliness and resultant depreciation of adjoining residential property values''* and considered the fact that the used car lot interfered *''with the use, comfort and enjoyment of such surrounding residential properties.''* (Italics supplied.)

*Parkersburg Builders Material Co. v. Barrack, supra, Carter v. City of Bluefield, supra,* and *Martin v. Williams, supra,* are the most recent decisions of this Court bearing directly on the question of the weight which may be given to esthetics and related considerations in the exercise of the police power; and they are, therefore, the most appropriate precedents for our consideration to be found among the prior decions of this Court. It is obvious that they are adequate to support the validity of a legislative enactment based on an exercise of the police power if it appears that such enactment may reasonably be predicated on considerations of noise, unsightliness, a thing visually offensive, a tendency to depress neighborhood property values, and an interference with the use, comfort and enjoyment of surrounding residential properties. To say the very least, the prior decisions of this Court are authority for the proposition that unsightliness may be considered with other proper factors in upholding a legislative enactment based on an exercise of the police power. Therefore, the various factors referred to in this paragraph were proper ones to be considered by the legislature in the enactment of the statute under consideration herein. ''Dealers in secondhand articles, and particularly junk dealers, are constantly receiving stolen goods, either innocently or otherwise. * * * For these and other reasons they are subject to rigid control and regulation, under the police power of the state.'' 47 Am. Jur., Secondhand Dealers, Section 3, page 554. Counsel for the defendant in his brief states: ''It is established that disabled and junked automobiles most generally retain quantities of gasoline and oil which produce a fire hazard or a trap for children playing with fire. The old junked 'icebox' has made more than one headline as a death trap for a playful child.

48

The existence of these conditions, plus the invitation to play and plunder, most certainly establish sufficient constitutional grounds for the regulation of junk yards.''

Section 7 of the statute in question provides: ''Nothing herein contained shall be construed to affect, set aside or alter the provisions of chapter eleven, article twelve, section seven of this code.'' This reference is to other statutes of this state regulating junk dealers and their agents. There can be no question of the right by legislation reasonably to regulate junk dealers. We can not say that the legislature was unjustified under its police power, based on considerations heretofore considered herein, in the enactment of the statute in controversy, including the set-back provisions and those relating to fences. No doubt the legislature took into consideration, among all other factors, an effort to promote public pride and public spirit, both on a statewide and local basis, and also a plan and purpose to promote efforts to attract to the state tourists and other travelers on our highways, with a view of promoting the economic well-being and the general welfare.

We do not consider it within the province of the courts to override the judgment of the legislative branch of government in an area which must necessarily be a matter of legislative determination. *State Road Commission v. The County Court of Kanawha County,* 112 W. Va. 98, 163 S. E. 815; *Bent v. Weaver,* 108 W. Va. 299, 150 S. E. 738; *South Morgantown v. Morgantown,* 49 W. Va. 729, 40 S. E. 15. We apprehend that the duty of the courts to uphold basic, important constitutional principles can be performed as well by according to the other two branches of government their proper functions, prerogatives and powers as by invalidating legislative enactments which are clearly unconstitutional. Our adherence to constitutional requirements and our ''frequent recurrence to fundamental principles'' may be made manifest in ways other than by declaring laws unconstitutional.

Authorities from other jurisdictions bearing upon the primary question presented, but not in all instances supporting the views herein expressed, are as follows: *Highway 100 Auto Wreckers, Inc. v. City of West Allis* (Wis.), 96 N. W. 2d 85, rehearing denied 97 N. W. 2d 423; *City of Shreveport v. Brock,* 230 La. 651, 89 So. 2d 156; *People v. Sevel* (Cal.) 261 P. 2d 359; *Vermont Salvage Corporation v. St. Johnsbury,* 113 Vt. 341, 34 A. 2d 188.

In the light of the allegation of the petition that the effect of the statute in the peculiar circumstances of the plaintiff's case will be to put him out of business and to prohibit the continued operation thereof on its present location, the trial court, while holding that the statute is valid, held it invalid as it relates to the plaintiff. On demurrer to the petition this allegation is, of course, taken as true. Ultimately, such allegation may or it may not be supported by proof. It does appear, however, that if this is designed to be a test case, certainly an appropriate situation was selected for the test in view of the peculiar location of the plaintiff's property between two public highways. We are of the opinion that the allegations of the petition disclose that the statute, though valid in general scope and broad outline, is arbitrary and unreasonable as its application relates to the plaintiff and to that extent is invalid. In *Carter v. Bluefield,* 132 W. Va. 881, pt. 8 syl., 54 S. E. 2d 747, the Court stated: "A municipal ordinance creating zoning districts and imposting restrictions upon the use of property within such districts may be valid in its general scope and broad outline but invalid to the extent that the restrictions imposed are clearly arbitrary and unreasonable in their application to particular property."

For the reasons stated herein, the judgment of the Circuit Court of Kanawha County is affirmed and this case is remanded to that court with directions to proceed therein in a manner consonant with the principles stated in this opinion.

*Affirmed;*
*remanded with directions*

HAYMOND, PRESIDENT, dissenting:

Though I concur in the decision of the majority of this Court to the extent that it holds that the constitutionality of the statute involved, Chapter 89, Article 23, Acts of the Legislature, Regular Session, 1959, may be determined in this proceeding for a declaratory judgment, and that the statute, in its application to the junk yard business and the property of the plaintiff with and on which it is operated, imposes arbitrary and unreasonable restrictions upon its use, I emphatically disagree with the decision to the extent that it upholds the constitutionality of the statute in its general scope and broad outline as a valid exercise of the police power of this State. I vigorously dissent from the holding of the majority because my considered judgment and firm conviction are that the restrictive provisions of the statute are not only arbitrary and unreasonable limitations of fundamental personal and property rights, but are also without, and do not bear, any substantial relation to the public health, safety, morals or general welfare, and that for that reason they do not constitute a valid exercise of the police power of this State.

The junk business which includes the operation of a junk yard and the activities of a junk dealer is recognized as a lawful business by the State and any person who engages in it, before so doing, must obtain a license and pay a tax for such license as prescribed by Section 31, Article 12, Chapter 11, Code, 1931, as amended by Section 31, Article 12, Chapter 119, Acts of the Legislature, Regular Session, 1939. That a junk yard is a legitimate business for which a license is required, is clearly established by the last mentioned statute. Moreover that statute is a revenue measure which prescribes the qualifications of persons who may obtain a license under the statute. That statute in the main constitutes a valid exercise of the taxing power, rather than the exercise of the police power of the State, al-

though the police power, of course, relates to the provisions which deal with criminal offenses and penalties. This is so, not because the statute applies to the junk business, but because the police power bears a substantial relation to criminal law and its enforcement. If the junk business were not a legitimate business the statute which subjects it to the payment of a license tax would be invalid and unenforceable as against public policy. In this jurisdiction the Legislature may not enact a statute which imposes a license tax upon a person who engages in the operation of an unlawful business. *Thompson v. Hall,* 104 W. Va. 76, 138 S. E. 579.

That the operation of a junk yard is a lawful business is generally recognized by the courts. *Town of Vestal v. Bennett,* 199 Misc. 41, 104 N. Y. S. 2d 830; *City of New Orleans v. Southern Auto Wreckers,* 193 La. 895, 192 So. 523; *State v. Brown,* 250 N. C. 54, 108 S. E. 2d 74. In *Parkersburg Builders Material Company v. Barrack,* 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291, 110 A. L. R. 1454, on which the majority, in large measure, relies to sustain its palpably erroneous conclusion that the statute here under consideration is a valid exercise of the police power, this Court expressly recognized a junk yard as a lawful business and refused to enjoin its operation as a nuisance in a section of a city which was not a clearly established residential area. In that case, instead of condemning the lawful business of operating a junk yard, as does the majority purely on aesthetic grounds and because of its unsightliness, this Court, speaking through Judge Maxwell, whose opinion and distinguished judicial service the majority approves and justly extols, in appraising and describing a junk yard used this language: ''An automobile junk yard is not necessarily an objectionable place. The business of buying old automobiles, wrecking them and selling serviceable parts as such and junking the residue is an honorable and useful business.''

The drastic statute, the validity of which is here involved, is not a revenue statute, as is Section 31, Article

12, Chapter 11, Code, 1931, as amended by Section 31, Article 12, Chapter 119, Acts of the Legislature, Regular Session, 1939, but, on the contrary, is a statute which in effect prevents the operation of or destroys a lawful junk yard business located outside a municipality unless its owner or operator complies with the arbitrary and unreasonable location and fencing requirements which the statute imposes. In effect its enforcement constitutes a taking of the property of its owner without just compensation and deprives him of his property without due process of law. *General Electric Company v. A. Dandy Appliance Company, Inc.,* 143 W. Va. 491, 103 S. E. 2d 310; *State v. Memorial Gardens Development Corporation,* 143 W. Va. 182, 101 S. E. 2d 425; *Carter v. City of Bluefield,* 132 W. Va. 881, 54 S. E. 2d 747; *State ex rel. Johnson v. City of Charleston,* 91 W. Va. 318, 112 S. E. 577; *Fruth v. Board of Affairs,* 75 W. Va. 456, 84 S. E. 105, L.R.A. 1915C 981; *Arverne Bay Construction Company v. Thatcher,* 278 N. Y. 222, 15 N. E. 2d 587, 117 A.L.R. 1110; *Eaton v. Sweeny,* 257 N. Y. 176, 177 N. E. 412; *Wolff Packing Company v. Court of Industrial Relations,* 262 U.S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A.L.R. 1280; *Nebbia v. People of State of New York,* 291 U.S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A.L.R. 1469; *Lakewood Express Service v. Public Utility Commissioners,* 1 N. J. 45, 61 A. 2d 730.

I have no quarrel with the statement in the majority opinion concerning the nature and the source of the police power. The basis of my disagreement is that it does not apply to the junk yards mentioned in the statute. It is crystal clear to me that the provisions of the statute bear no real or substantial relation to the public health, safety, morals or the general welfare of the area affected. The police power of the State is an attribute of sovereignty which is co-extensive with the State. It is difficult to define because it can not be circumscribed by mere words; it is latent in its nature, yet, nevertheless, it exists perennially as a vast reservoir of authority to be exercised by the law-mak-

ing branch of the government for the public good. *Quesenberry v. Estep,* 142 W. Va. 426, 95 S. E. 2d 832; *The City of Huntington v. State Water Commission,* 137 W. Va. 786, 73 S. E. 2d 833; *Hayes v. The Town of Cedar Grove,* 126 W. Va. 828, 30 S. E. 2d 726, 156 A.L.R. 702; *Prager v. W. H. Chapman and Sons Company.* 122 W. Va. 428, 9 S. E. 2d 880, 129 A.L.R. 1114; *Nulter v. State Road Commission,* 119 W. Va. 312, 193 S. E. 549, 194 S. E. 270; *Chicago, Burlington and Quincy Railroad Company v. Illinois,* 200 U.S. 561, 26 S. Ct. 341, 50 L. Ed. 596.

The police power is vested in the legislative branch of the government. It may be employed or delegated by the Legislature subject only to the control of the courts to the extent that they may properly act, and under the police power the Legislature may provide for the protection of the safety, health, morals and general welfare of the people. *Quesenberry v. Estep,* 142 W. Va. 426, 95 S. E. 2d 832; *The City of Huntington v. State Water Commission,* 137 W. Va. 786, 73 S. E. 2d 883; *State ex rel. Morris v. West Virginia Racing Commission,* 133 W. Va. 179, 55 S. E. 2d 263; *Hayes v. The Town of Cedar Grove,* 126 W. Va. 828, 30 S. E. 2d 726, 156 A.L.R. 702; *State v. Bunner,* 126 W. Va. 280, 27 S. E. 2d 823; *Prager v. W. H. Chapman and Sons Company,* 122 W. Va. 428, 9 S. E. 2d 880, 129 A.L.R. 1114.

All legislation under the police power, however, must be within the constitutional inhibitions. *General Electric Company v. A. Dandy Appliance Company, Inc.,* 143 W. Va. 491, 103 S. E. 2d 310; *State v. Memorial Gardens Development Corporation,* 143 W. Va. 182, 101 S. E. 2d 425; *Milkint v. McNeeley,* 113 W. Va. 804, 169 S. E. 790; *Eubank v. City of Richmond,* 226 U.S. 137, 33 S. Ct. 76, 57 L. Ed. 156. A statute or an ordinance may not, under the guise of the police power, impose arbitrary or unreasonable restrictions upon private property or the pursuit of useful activities, *Quesenberry v. Estep,* 142 W. Va. 426, 95 S. E. 2d 832; *Carter v. City of Bluefield,* 132 W. Va. 881, 54 S.E.

2d 747; *Lawton v. Steele,* 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385; *Anderson v. Jester,* 206 Iowa 452, 221 N. W. 354; *Merrill v. City of Wheaton,* 356 Ill. 457, 190 N. E. 918; and to be valid the statute or the ordinance must bear some real or substantial relation to the public health, safety, morals or general welfare of the area affected. *Quesenberry v. Estep,* 142 W. Va. 426, 95 S. E. 2d 832; *Carter v. City of Bluefield,* 132 W. Va. 881, 54 S. E. 2d 747; *Nectow v. City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842; *Women's Kansas City St. Andrews Society v. Kansas City, Missouri,* 8 Cir., 58 F. 2d 593; *Hurst v. Burlingame,* 207 Cal. 134, 277 P. 308; *Forbes v. Hubbard,* 348 Ill. 166, 180 N. E. 767; *Sundlun v. Zoning Board of Review,* 50 R. I. 108, 145 A. 451; *Standard Oil Company v. City of Bowling Green,* 244 Ky. 362, 50 S. W. 2d 960, 86 A. L. R. 648; *Freeman v. Board of Adjustment,* 97 Mont. 342, 34 P. 2d 534.

The statute here under review was clearly not intended by the Legislature to regulate or affect the public health, safety, morals or the general welfare of the people. Nowhere in the statute is public health, safety, morals or the general welfare referred to or even mentioned. The express purpose sought to be accomplished by the enactment of the statute, as clearly and expressly stated in Section 2, is solely to obscure or conceal from the designated highways the view of a junk yard by the use or employment of natural objects or the fence required by the statute and that is its sole and exclusive purpose. Of course, the view of the junk yard to be obscured or concealed is for the benefit of travelers on the highway, most of whom will consist of persons who possess no property rights or interests in the neighborhood that could in any way be affected by the presence of the junk yard, or of persons who as travelers from distant sections or localities in this State or other states are engaged in an uninterrupted trip or journey through the area. No other possible or reasonable meaning or effect can be derived from this provision of Section 1: " 'Fence'

shall mean an enclosure at least six feet in height *so constructed and maintained as to obscure the junk* in said enclosure *from ordinary view to those persons passing upon the highways in this state.*'' (Emphasis supplied); or from these provisions of Section 2: ''If a junk yard is operated or maintained within three hundred feet of any secondary highway *the view thereof from such highway shall be obscured* by natural objects or a fence as herein defined; *Provided, however, that a* dealer who was maintaining or operating a junk yard prior to January one, one thousand nine hundred fifty-nine, outside a municipality shall be granted a license if his junk yard is operated or maintained more than one hundred feet from any primary, interstate or secondary highway right-of-way and *the view thereof from such highway is obscured* by natural objects as herein defined.'' (Emphasis supplied). If the foregoing language of the statute means anything there can be no doubt that all the Legislature sought to do by enacting this statute was merely to keep transient travelers on the highway from seeing an ugly, unsightly and unpopular, but not a dangerous, or an immoral or an unhealthful, junk yard while proceeding at varying speeds along the highway on foot, on horseback, or by motor vehicle to pass through the area. If the traveler on the highway, whether he be a transient or a resident of the area, wants to look at a junk yard, he should not be deprived of his personal right to do so by solemn legislative fiat and if he does not want to do so, such action is not only entirely unnecessary but to me, to say the least, trivial in the extreme, and violates the universally recognized presumption that the Legislature did not intend to do ''a void and useless thing.'' *Williams v. Commonwealth,* 190 Va. 280, 56 S. E. 2d 537; 82 C.J.S., Statutes, Section 316.

In short, and to me, beyond all question of a doubt, the sole and only ground on which the restrictive provisions of the statute can be based or justified is to avoid offending, because of the aesthetic element involved, persons of varying degrees of sensibility who

might, but for the compliance with the requirement of the statute, happen to look at an ugly junk yard beside a roadway upon which they might be traveling at the time. This accomplishment certainly indicates an unusual amount of concern for the transient user of the highway, but manifests no consideration or regard for the consequent inevitable invasion of the fundamental personal and property rights of the owners and operators of the unsightly and unpopular junk yards who are permanent and useful citizens and residents of the State engaged in the operation and maintenance of a lawful business enterprise in which they have made substantial investments and for which they hold a license and pay a tax.

There is nothing in the record of this proceeding that indicates or charges that the junk yards to which the provisions of the statute apply are unsafe, immoral, or detrimental to the health or the general welfare of the community in which any of them is located. No provision of the statute mentions or refers to the public safety, morality, health or general welfare with respect to the location or the operation of the junk yard to which it applies. As far as the restrictive provisions of the statute are concerned, if the owner or the operator of a junk yard obscures or conceals it from the view of persons traveling upon the highways by the use of natural objects or the fence required for that purpose and locates the junk yard at the distance from the highway designated by the statute, he can operate his establishment in any manner he may choose, even in a manner that will impair or contravene the public health, safety, morals or the general welfare of the community. When he has located his junk yard and constructed the fence or used the natural objects in the manner required by the statute his junk yard will be just as safe or unsafe, just as moral or immoral, and just as healthful or unhealthful, as it was or would have been if he had not located it or made use of the natural objects or built the fence in accordance with the requirements of the statute. Certainly

further comment is unnecessary to show conclusively that the requirements of the restrictive provisions of the statute bear absolutely no substantial relation to the public health, safety, morals or general welfare of the community which singly or together are essential to justify the exercise of the police power of the State. I repeat that the only factor to which the provisions of the statute actually and in fact apply is the vague, ambiguous, uncertain, indefinable aesthetic factor for the determination of which in any given set of circumstances no suitable standard is or may be clearly fixed or established. Whether a particular activity is desirable or undesirable, or is or is not offensive to the sensibilities of different persons of varying social, artistic or cultural environment or development is and will remain a debatable and highly controversial question as long as people exercise their fundamental right to adopt and follow their individual tastes and preferences with respect to subjects which involve the aesthetic factor or element. That is why this Court, until the present decision, and the courts, in general, have consistently rejected the aesthetic factor, while standing alone, as the basis for the valid exercise of the police power of the State.

As I have demonstrated, a junk yard is a lawful licensed business, a business which Judge Maxwell, to whom the majority has referred, has characterized as "an honorable and useful business," in expressly rejecting the aesthetic factor as the ground or basis for enjoining the operation of a junk yard as a nuisance at the instance of plaintiffs who asserted that the operation of the junk yard violated their personal and property rights. That decision was reached in *Parkersburg Building Material Company v. Barrack,* 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291, 110 A.L.R. 1454, a case which involved only the jusidiction of a court of equity to abate a nuisance and in which the exercise of the police power was not involved or considered or determined. The business of operating a junk yard is also recognized by the courts that con-

stitute the decided weight of judicial authority as a business which is not inherently dangerous, immoral, or offensive to the public health or general welfare. This proposition is not entirely rejected by the majority but apparently is accepted with the qualification that "Dealers in secondhand articles, and particularly junk yards, are constantly receiving stolen goods, either innocently or otherwise.", and the approval of the statement in the brief of the defendant that "It is well established that disabled and junked automobiles most generally retain quantities of gasoline and oil which produce a fire hazard or a trap for children playing with fire." I dismiss these qualifying quotations with the comment that any legitimate automobile or machine repair business or any legitimate agency engaged in the purchase or sale of secondhand materials, which obviously is not within the police power of the State, may be similarly accused. For instance a grist mill through improper operation may become infested with rats or other vermin which render it unsanitary, a planing mill, lumber yard or furniture manufacturing plant may become, by the accumulation of inflammable or combustible material, an unsafe fire hazard, or an apartment or a residence may be used for gambling or lewd and immoral or other criminal purposes; but surely it can not be that any of these instrumentalities is subject to the exercise of the police power.

The unsafe, immoral or health endangering operation by a person who engages in such practices, however, is not an inherent fault of the business, but the fault of the operator, and does not condemn or render it inherently unlawful as an enterprise. Of course, if the operator of any business engages in criminal activities or conducts it in a manner that injures the public health, safety, morals or general welfare he can and should be prosecuted under existing law or the operation of the business in that manner may be enjoined as a nuisance by a court of equity. But no such improper or unlawful operation of the junk yards to which the statute here under review applies is involved

or presented in this proceeding and any reference of that character with respect to the junk business in the majority opinion is entirely irrelevent and purely gratituous, and is not pertinent in the determination of the question of the validity of the statute as a proper exercise of the police power of the State.

In a well considered case which is in accord with the clear weight of authority concerning the generally recognized character of the junk business, *State v. Brown*, 250 N. C. 54, 108 S. E. 2d 74, decided as recently as April 8, 1959, the Supreme Court of North Carolina, quoting from the opinion in *City of New Orleans v. Southern Auto Wreckers*, 193 La. 895, 192 So. 523, said "Dealing in junk is a legitimate and harmless business. Junk yards are not necessarily nuisances. They do not affect the public health, nor do they offend against public morals. Individuals have the constitutional right to use their private property for junk yards so long as such use does not offend public morals or jeopardize the health and safety of the public. In speaking of the right of individuals who use their private property as they see fit, so long as their use of it is not offensive or dangerous, it is stated in American Jurisprudence, Volume 11, Sec. 279, p. 1037: 'Nevertheless, the owner has the right to erect such structures or to use the property for such legitimate purposes as he may see fit, utilizing such portions of it as he pleases, so long as in so doing he in no manner injuriously affects the public health, safety, morals, and general welfare. Any law abridging rights to a use of property, which use does not infringe the rights of others, or limiting the use of property beyond what is necessary to provide for the welfare and general security of the public is not a valid exercise of the police power.' " In *Town of Vestel v. Bennett*, 199 Misc. 41, 104 N.Y.S. 2d 830, the court used this language: "It is difficult to imagine what danger to public health, morals or safety exists in connection with the operation of a junk yard on an unenclosed lot that could be removed or prevented by the erection of a

solid board fence six feet high. Certainly there is nothing immoral about a junk yard. Neither does it constitute any menace to public health or if, by reason of unsanitary conditions being permitted, it should be come a menace, putting a board fence around it could not be a reasonable solution of the problem. No danger to public safety is apparent except that materials from the yard might find their way on to the highway if piled too close, but to prevent this a solid board fence would not be required as was pointed out in the case of the *City of New Orleans v. Southern Auto Wreckers*, 193 La. 895, 192 So. 523." The statute here under review does not relate to or deal with any obstruction of a public highway by any of the contents of a junk yard and no such purpose is involved in connection with the requirement that such yard be located at designated distances from the highway. Of course, the police power applies to a public highway and the manner of its use or obstruction for the obvious reason that the operation and maintenance of the public highway directly relates to the public safety and the general welfare of the community which it serves and through which it passes.

I challenge the soundness of the statement in the majority opinion that "We can not say that the legislature was unjustified under its police power, *based upon considerations heretofore considered herein,* in the enactment of the statute in controversy, including the set-back provisions and those relating to fences. No doubt the legislature took into consideration, *among all other factors,* an effort to promote *public pride and public spirit,* both on a statewide and local basis, and also a plan and purpose to promote efforts to attract to the state tourists and other travelers on our highways with a view of promoting the *economic well-being* and general welfare." (Emphasis supplied). This statement, in its entirety, will not bear even reasonably close scrutiny or analysis for, as I have demonstrated, no factor involving public health, safety, morals, or the general welfare, or any factor, other

than the aesthetic factor, which includes the quoted elements of *"public pride and public spirit"*, was considered by the Legislature in the enactment of the statute, as the statute itself and most of the quoted statement from the opinion of the majority clearly indicate. It should be perfectly obvious to any reasonably intelligent person that any improvements such as a new mercantile establishment, an industrial or manufacturing plant, an apartment building, or a few spacious residences will promote the "economic well being" of a community, but it should also be just as clear to any court that none of such instrumentalities is subject to the exercise of the police power of the State; for if any of them is within the police power it applies to every kind of activity and, though we all know it does not so apply, its exercise can not be restricted even by the constitutional limitations of due process and the taking of private property without just compensation.

The obvious confusion and the palpable error in the majority opinion stem in large measure from the failure of the majority to recognize the material and fundamental difference between the judicial power of a court of equity, in a proper case at the instance only of persons whose personal or property rights are invaded by the operation of an instrumentality, to declare such instrumentality a nuisance and to abate and enjoin its operation as such, and the power of the legislative branch of the government to exercise the police power of the State. This manifest confusion is indeed surprising in view of the use of a quotation from the concurring opinion of Judge Kenna in *Parkersburg Builders Material Company v. Barrack,* 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291, 110 A.L.R. 1454, which clearly emphasizes that distinction. As adopted with approval in the majority opinion, that quotation is: "There is to my mind a clear and most decided difference between direct control by the courts through the process of injunction on the one hand, and the control exercised by the legislative branch through the use of the police power on the other."

Many of the cases cited in the majority opinion in support of its decision in this case are cases in which the jurisdiction of a court of equity was invoked by a property owner to abate or enjoin an alleged nuisance on the ground that its operation invaded the personal or property rights of the person who sought that type of equitable relief. *Martin v. Williams,* 141 W. Va. 595, 93 S. E. 2d 835, and *Parkersburg Builders Material Company v. Barrack,* 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291, 110 A.L.R. 1454, which are two of the three cases on which the majority expressly and mainly relies to support its conclusion, were suits in equity in which the plaintiff sought to abate the operation of a particular lawful business as a nuisance. In neither case was the valid exercise of the police power involved, or carefully considered, or determined.

In the *Parkersburg* case this Court refused to enjoin the operation of a junk yard in a section of the city of Parkersburg which was not clearly established as a residential community and, though stating in the opinion that ''Courts must not be indifferent to the truth that within essential limitations aesthetics has a proper place in community affairs of modern society.'', without specifying the extent of such ''proper place'', expressly rejected the aesthetic factor, even in a nuisance case, as the sole ground for injunctive relief with respect to an alleged nuisance. In that case other essential factors, such as noise, dust, or unwholesome odors, were absent, and this Court expressly held in the syllabus that ''Where a section of a city is not a clearly established residential community, equity will not be warranted in excluding therefrom as a nuisance an automobile wrecking business merely on the ground of unsightliness.'' Thus the factor of aesthetics, when first sympathetically dealt with by this Court, as mere *obiter dicta,* was utterly rejected as a ground for equitable relief in a case which did not involve the exercise of the police power but involved instead the abatement of an alleged nuisance. How this case can be converted to, or be seriously considered as, authority for the valid exercise of the police power in this proceeding in

the face of its holding that the aesthetic factor alone did not constitute a ground for even injunctive relief in equity is to me entirely incomprehensible.

The *Martin* case was also a suit in equity to abate an alleged nuisance and in it the exercise of the police power was likewise not involved, considered or determined. In that case the main elements on which injunctive relief was sought, and granted, against the operation of a used car lot alleged to be a private nuisance in a predominantly residential community were loud noises at night and during early hours of the morning and the projection of excessive rays of bright light into the costly homes of the plaintiffs which disturbed their sleep and comfort. Though it is true that a portion of the equipment on the lot presented what the plaintiffs asserted was a garish and unsightly appearance for that particular neighborhood and that the aesthetic factor was to that extent involved and taken into consideration in the decision of the case, the basis on which injunctive relief was granted was the annoyance caused by noise and light in combination with the aesthetic factor, which of itself was not regarded as a sufficient or independent ground upon which to grant injunctive relief. It is clear that in that case, if the aesthetic factor had been missing, the relief sought would have been granted. I thought then, and I think now, that the decision, which was by a divided court in that case, was contrary to the prior decisions of this Court and clearly wrong for the reasons set forth at length in the dissenting opinion which I filed in that case. But whether that decision be regarded as clearly right or clearly wrong, it can not be regarded as authority to sustain the constitutionality of the statute here under review as a valid exercise of the police power of the State.

The cases of *Ritz v. The Woman's Club of Charleston,* 114 W Va. 675, 173 S. E. 564, and *Snyder v. Cabell,* 29 W. Va. 48, 1 S. E. 241, cited and discussed and apparently relied upon by the majority, were suits in equity by real estate owners to enjoin an alleged nuis-

ance which violated the personal and property rights of the plaintiffs. In each case injunctive relief was granted.

In the *Snyder* case the noise which resulted from the operation of a skating rink deprived the persons occupying two of the homes of the plaintiffs of sleep and rest, materially disturbed their comfort and the enjoyment of their homes, and compelled one of the plaintiffs to leave and vacate his residence.

In the *Ritz* case the dances at night permitted by the defendant at its club house near the residence of the plaintiffs were attended by many persons who engaged in noisy, drunken and unseemly conduct which deprived the plaintiffs of rest and sleep.

In each of those cases noise was the sole basis for the relief awarded the plaintiffs. No aesthetic factor or question with respect to the exercise of the police power was involved or even discussed or mentioned in either case. As those cases do not in any way involve the application of the police power of the State there was no reason to cite and discuss them in the majority opinion; and the reference to them merely confuses the real issue and demonstrates the failure of the majority to recognize the distinction, emphasized by Judge Kenna in the *Parkersburg* case, between the jurisdiction of equity to enjoin a nuisance and the exercise of the police power by the legislative branch of the government.

In its labored and utterly fruitless effort to find and apply any prior decision of this Court to support its action in upholding the constitutionality of the statute here under review, except as to its arbitrary and unreasonable application to the property of the plaintiff, the majority, in its decision, embodies these surprisingly inapplicable, ambiguous and legally and factually erroneous statements: "*Parkersburg Builders Material Company v. Barrack,* supra, *Carter v. City of Bluefield,* supra, and *Martin v. Williams,* supra, are the most recent decisions of this Court bearing directly

on the question of the weight which may be given to aesthetics and related considerations in the exercise of the police power; and they are, therefore, the most appropriate precedents for our consideration to be found among the prior decisions of this Court. It is obvious that they are adequate to support the validity of a legislative enactment based on an exercise of the police power if it appears that such enactment may reasonably be predicated on considerations of noise, unsightliness, a thing visually offensive, a tendency to depress neighborhood property values, and an interference with the use, comfort and enjoyment of surrounding residential properties. To say the very least, the prior decisions of this Court are authority for the proposition that unsightliness may be considered with other proper factors in upholding a legislative enactment based on an exercise of the police power.'' As to that part of the foregoing statement which cites the *Parkersburg, Carter* and *Martin* cases as supporting authority with respect to the factor of aesthetics in the exercise of the police power, the cited cases completely refute and destroy its meaning and effect. As I have already pointed out, the *Parkersburg* and *Martin* cases, involved the right of persons, whose personal and property rights were involved, to injunctive relief against a private nuisance and did not involve the exercise of the police power which was not raised or presented and was not even considered or discussed as a point of decision. In the *Parkersburg* case, though the aesthetic factor was given sympathetic consideration by statements which were merely *obiter dicta,* that factor, standing alone, as it clearly does in the case at bar, was expressly rejected as a ground of injunctive relief in the abatement of a private nuisance and, of course, it was not recognized as a basis for the exercise of the police power. In the *Martin* case the aesthetic factor, which was obviously less important than the main factors of noise and excessive light, was considered and discussed, but the elements of noise and light were the basis for the award of injunctive relief; and there is no pronouncement in that case, in which

the exercise of the police power was not involved or considered, to indicate that the relief granted would have been awarded if the aesthetic factor alone and not in combination with the elements of noise and light, had constituted the sole ground for injunctive relief.

In *Carter v. City of Bluefield*, 132 W. Va. 881, 54 S. E. 2d 747, in which I prepared the unanimous opinion of this Court, the exercise of the police power was involved by virtue of the enactment of a zoning ordinance by the City of Bluefield. In that case the validity of the ordinance was upheld to the extent that the restrictions imposed by it were not arbitrary or unreasonable and bore a substantial relation to the public health, safety, morals or the general welfare of the municipality, point 7 of the syllabus; but to the extent that its restrictions, in their application to the property of the plaintiffs, did not bear a substantial relation to the public health, safety, morals or general welfare of the municipality, and were arbitrary and unreasonable in depriving the plaintiffs of the beneficial use of their property and in substantially depreciating its value, the ordinance was held to be invalid as violative of Sections 9 and 10, Article III of the Constitution of this State and the Fourteenth Amendment to the Constitution of the United States; point 9 of the syllabus. In the *Carter* case aesthetics, as the basis for the exercise of the police power, was not involved, presented, considered or even discussed. For that reason that decision is utterly without application to the case at bar and can not reasonably be considered as authority in support of the conclusion reached by the majority. In the *Carter* case the zoning ordinance, in its general scope and broad outline, was upheld, as zoning ordinances, since the decision by the Supreme Court of the United States in *Village of Euclid v. Ambler Realty Company*, 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A.L.R. 1016, in 1926, generally have been upheld, not because of the presence of the aesthetic factor which clearly and by its very nature, does not directly affect the public health, safety, morals or general wel-

fare, but because zoning ordinances which deal with and regulate the development and maintenance of substantial community areas necessarily do bear a substantial relation to the public health, safety, morals and general welfare of the territory to which they apply. In the opinion in the *Carter* case, stating the reason for upholding the validity of the ordinance in its general scope and broad outline, this Court said:

"Since the decision of the Supreme Court of the United States in the leading case of *Village of Euclid v. Ambler Realty Company,* 272 U. S. 365, 47 S. Ct. 114, 71 L. ed. 303, 54 A.L.R. 1016, zoning ordinances establishing residential districts from which business and trade of every kind are excluded have been widely recognized as valid with respect to their general scope and dominant features as a proper exercise of the police power of the State. See Annotations, 86 A.L.R. 659 and 117 A.L.R. 1119 and the cases cited. Such ordinances, however, are justified only by the exercise of some aspect of the police power in the interest of the public, *State ex rel. Seattle Title Trust Company v. Roberge,* 278 U. S. 116, 49 S. Ct. 50, 73 L. ed. 210, 86 A.L.R. 654; *Dowsey v. Village of Kensington,* 257 N. Y. 221, 177 N. E. 426, 86 A.L.R. 642; and to be valid they must bear some real or substantial relation to the public health, safety, morals, or the general welfare of the area affected. *Nectow v. City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. ed. 842; *Women's Kansas City St. Andrews Society v. Kansas City, Missouri,* (C.C.A. 8th) 58 F. 2d 593; *Hurst v. Burlingame,* 207 Cal. 134, 277 P. 308; *Forbes v. Hubbard,* 348 Ill. 166, 180 N. E. 767; *Sundlun v. Zoning Board of Review,* 50 R. I. 108, 145 A. 451; *Standard Oil Company v. City of Bowling Green,* 244 Ky. 362, 50 S. W. 2d 960, 86 A.L.R. 648; *Freeman v. Board of Adjustment,* 97 Mont. 342, 34 P. 2d 534.

"A statute or an ordinance may not, however, under the guise of the police power, impose arbitrary or unreasonable restrictions upon the use of private property or the pursuit of useful activities. *Lawton v.*

*Steele,* 152 U. S. 133, 14 S. Ct. 499, 38 L. ed. 385; *Anderson v. Jester,* 206 Iowa 452, 221 N. W. 354; *Merrill v. City of Wheaton,* 356 Ill. 457, 190 N. E. 918. * * *.

"The power to interfere by zoning regulations with the general rights of a landowner by restricting the character of his use is not unlimited and a restriction can not be imposed unless it bears a substantial relation to the public health, safety, morals or the general welfare. *Nectow v. City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. ed. 842. Private property may not be taken without compensation, even for a public purpose or to advance the general welfare. *Arverne Bay Construction Company v. Thatcher,* 278 N. Y. 222, 15 N. E. 2d 587, 117 A.L.R. 1110; *Eaton v. Sweeny,* 257 N. Y. 176, 177 N. E. 412."

From the foregoing it should be obvious that the statute here under review is not, and bears no resemblance to, a zoning statute or ordinance and that, contrary to the statements in a portion of the above mentioned quotation in the majority opinion, none of the factors of noise, unsightliness, or interference with the use, comfort and enjoyment of surrounding residential properties was involved or considered in determining the validity of the zoning ordinance in the *Carter* case, or in any prior decision of this Court in which the exercise of the police power was upheld as valid. On the contrary in all its prior decisions this Court has consistently and without exception held that the aesthetic factor alone, which bears no substantial relation to the public health, safety, morals or general welfare, will not support or justify the exercise of the police power of the State. *Fruth v. Board of Affairs,* 75 W. Va. 456, 84 S. E. 105, L.R.A. 1915C 981; *State ex rel. Sale v. Stahlman,* 81 W. Va. 335, 94 S. E. 497; *State ex rel. Nunley v. Mayor and City Council of the City of Montgomery,* 94 W. Va. 189, 117 S. E. 888.

As the decision in the *Carter* case is completely contrary to the decision in the case at bar, to the extent that it upholds the constitutionality of the statute in

its general scope and broad outline, it is difficult to understand why the *Carter* case should be cited as supporting authority for the present decision.

In *Fruth v. Board of Affairs,* 75 W. Va. 456, 84 S. E. 105, L.R.A. 1915C 981, a case involving the exercise of the police power under an ordinance of the City of Charleston, this Court held in point 3 of the syllabus that "An ordinance of a municipal corporation ordained pursuant to a provision of its charter authorizing it, establishing a building line on a certain street and inhibiting abutting owners from encroaching thereon, based on merely aesthetic considerations, is not within the police power, and is unenforceable as a police regulation." In the unanimous opinion, referring to Freund on Police Power, this Court said: "The sections of Mr. Freund, particularly applicable to the case at bar, where the purposes of the statute and ordinance are aesthetic and not to provide for the safety, health and morals of the public in general, are sections 180 and 181. These latter sections say, in accordance with the holdings of the courts everywhere, that for mere beauty and symmetry of the streets, or for mere aesthetic purposes, having no reference to the safety, health, morals or general welfare of the community at large, the state may not under the police power regulate or control the use by the owner of private property; that such right of regulation if exercised at all must be done under the power of eminent domain, and within constitutional limitations requiring just compensation to be paid for the taking or damaging of private property."

In *State ex rel. Sale v. Stahlman,* 81 W. Va. 335, 94 S. E. 497, this Court held in point 1 of the syllabus that under the provisions of a city charter authorizing it to regulate the height, construction and inspection of new buildings erected within its corporate limits, a city can not prevent the owner of a lot, situated in a built up section and between three and four story buildings, from erecting a one story building on such lot, by refusal of permission to erect such buildings. It also said

in points 4 and 5 of the syllabus that "A limitation upon an owner's use of his property cannot be imposed by law, for the benefit of other property owners.", and "Nor can it be imposed only to effect symmetry or ornamentation of a city, street or section, otherwise than under the power of eminent domain, allowing compensation, if at all." The opinion in that case contains these paragraphs:

"Ordinarily, such charter provisions confer power to limit or restrict the height of buildings, not to require it, as a means of promotion or conservation of the value of adjacent or neighboring property or attainment of aesthetic ideals or purposes of the community or municipal authorities, and their justification and validity rest upon the police power of the state, under which the legislature may directly or indirectly provide for the public health, morals, safety, convenience and prosperity. *Welch v. Swasey,* 193 Mass. 364; *Commonwealth v. Boston Advertising Co.,* 188 Mass. 348; *People v. D'Onech,* 111 N. Y. 359; *Fruth v. Board of Affairs,* 75 W. Va. 457; *Eubank v. Richmond,* 226 U. S. 137; *District of Columbia v. Brooks,* 214 U. S. 138; *C. B. & Q. Railway Co. v. Drainage Commissioners,* 200 U. S. 561." and

"The power and authority over the relators' property, claimed by the city, if allowed by law, would be a serious restraint upon his right of use and enjoyment. It cannot be imposed for the benefit of adjacent or neighboring property owners. *Eubank v. Richmond,* cited. Nor can it be imposed to effect symmetry of the city, street or section, otherwise than under the power of eminent domain, allowing compensation, if at all. *Fruth v. Board of Affairs,* cited."

In *State ex rel. Nunley v. Mayor and City Council of the City of Montgomery,* 94 W. Va. 189, 117 S. E. 888, this Court reaffirmed its holding in the *Fruth* and *State ex rel. Sale v. Stahlman* cases and held that the unsightliness of a proposed garage would not justify its prevention under a municipal ordinance based on the police power.

The majority opinion, though citing the three cases last cited, does not analyze them or recognize their force and effect as well considered binding authority to be followed and adhered to by this Court. Instead the majority opinion undertakes to circumvent or disregard those decisions by the obviously inept and unjustified suggestion that "it is not without basis to assert that *Fruth v. Board of Affairs,* supra, dealing with municipal building lines and *State v. Stahlman,* supra, dealing with municipal regulation of the height of buildings in business districts, have been *superseded and outmoded,* in some measure at least, by *Village of Euclid v. Ambler Realty Co.,* and *Carter v. City of Bluefield,* supra, which upheld the validity of zoning ordinances." First, it should be perfectly obvious that a solemn judicial pronouncement relating to fundamental constitutional rights and guarantees, such as the *Fruth* and *State ex rel. Sale v. Stahlman* cases, unlike a worn out machine or mechanical device or current fashions in personal attire, never becomes "outmoded." Instead it endures and directly affects the operation of government without regard to the period of its existence, until it is superseded, overruled or modified by a subsequent decision of the same or another court of competent jurisdiction, or is rendered ineffective by valid legislation. Nothing of that kind has happened to the three purportedly "outmoded" cases. On the contrary, they have been cited with approval in later related cases and none of them has ever been criticized, modified or departed from in any subsequent decision of this Court except the decision of the majority in the instant proceeding. Secondly, there is not the slightest conflict or inconsistency between them and *Village of Euclid v. Ambler Realty Company,* 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A.L.R. 1016, and *Carter v. City of Bluefield,* 132 W. Va. 881, 54 S. E. 2d 747, for the reasons already indicated, which are that the zoning ordinances under consideration in the *Village of Euclid* and *Carter* cases bore a real and substantial relation to the public health, safety, morals or general welfare of the community

affected, and in the *Fruth, State ex rel. Sale v. Stahlman* and *State ex rel. Nunley v. Mayor and City Council of the City of Montgomery* cases the aesthetic factor did not bear a substantial relation to the public health, safety, morals, or general welfare which justified the valid exercise of the police power. Instead of overruling, modifying, or criticizing the *Fruth* case, this Court cited it with approval in its opinion in the *Carter* case on which, surprising to relate, the majority relies to support its decision in this proceeding.

The three above mentioned cases are not only correct and sound in principle but are also completely in accord with the decisions of appellate courts in other jurisdictions which constitute the clear weight of judicial authority and which hold that aesthetics alone does not justify the exercise of the police power, that the valid exercise of that broad and far-reaching attribute of sovereignty must always bear a real or substantial relation to the public health, safety, morals or general welfare, and that aesthetics alone does not bear that relation to those essential factors. Many decisions of other appellate courts which so hold could be cited but these three which are directly in point will suffice: *Little Pep Delmonico Restaurant, Inc. v. City of Charlotte,* 252 N. C. 324, 113 S. E. 2d 422; *State v. Brown,* 250 S. C. 54, 108 S. E. 2d 74; *City of New Orleans v. Southern Auto Wreckers,* 193 La. 895, 192 So. 523.

In *Little Pep Delmonico Restaurant, Inc. v. City of Charlotte,* 252 N. C. 324, 113 S. E. 2d 422, the North Carolina Supreme Court, adhering to the decided weight of authority, used this language: "Courts are properly hesitant to interfere with a legislative body when it purports to act under the police power, but the exercise of that power must rest on something more substantial than mere aesthetic considerations. If it appears that the ordinance is arbitrary, discriminatory, and based solely on aesthetic considerations, the court will not hesitate to declare the ordinance invald. State v. Brown, 250 N. C. 54, 108 S. E. 2d 74; In re

O'Neal, 243 N. C. 714, 92 S. E. 2d 189; State v. Staples, 157 N. C. 637, 73 S. E. 112, 37 L.R.A., N. S., 696; Barger v. Smith, 156 N. C. 323, 72 S. E. 376; State v. Whitlock, 149 N. C. 542, 63 S. E. 123; 37 Am. Jur. 967-968."

I regard as unfortunate the unsound and inaccurate statements in the majority opinion to the effect that the property of the plaintiff, and by inference the property of the other persons affected, has not been taken, that his and their businesses have not been prohibited, and that he still has his property, may make a restricted use of his junk business, devote it to other uses, or remove it to another location. If the intended meaning of the foregoing language is that a statute which deprives its owner of the use or enjoyment of his property in its entirety or restricts the beneficial use of his property, so long as he retains its physical possession, does not constitute a taking, within the meaning of the provisions of the Constitution of this State and the Federal Constitution, it is contrary to all of the countless well considered decisions in the field of constitutional law which without exception recognize and uphold the express guarantees that private property shall not be taken or damaged without just compensation and that no person shall be deprived of life, liberty or property without due process of law. This Court has uniformly held in many cases, which accord with countless decisions of the courts in other jurisdictions in this country, that the substantial interference with the owner's beneficial use of his property and the serious depreciation in its value which result from a statute or an ordinance which does not bear a substantial relation to the public health, safety, morals or general welfare, constitute a taking of private property without compensation in violation of Section 9, Article III of the Constitution of this State, and deprive the owner of his property without due process of law in violation of Section 10, Article III of the Constitution of this State and the Fourteenth Amendment to the Constitution of the United States. *General Electric Company v. A. Dandy Appliance Company,* 143

W. Va. 491, 103 S. E. 2d 425; *State v. Memorial Gardens Development Corporation,* 143 W. Va. 182, 101 S. E. 2d 425; *Carter v. City of Bluefield,* 132 W. Va. 881, 54 S. E. 2d 747; *State ex rel. Johnson v. City of Charleston,* 91 W. Va. 318, 112 S. E. 577; *Fruth v. Board of Affairs,* 75 W. Va. 456, 84 S. E. 105, L.R.A. 1915C 981.

In *Carter v. City of Bluefield,* 132 W. Va. 881, 54 S. E. 2d 747, this Court held in point 9 of the syllabus that: "A zoning ordinance of a municipality, creating use districts and imposing restrictions upon the use of property in the various districts, which, as applied to particular property, does not bear a substantial relation to the public health, safety, morals, or the general welfare of the municipality, and is clearly arbitrary and unreasonable in depriving the owner of the beneficial use of his property and in substantially depreciating its value, is, as to such property, invalid as violative of Sections 9 and 10, Article III of the Constitution of this State and the Fourteenth Amendment to the Constitution of the United States."

In the opinion in the *Carter* case this Court used this pertinent language: "In short, the restrictions imposed by the ordinance damage the land of the petitioners as much as four fifths of its real and actual worth and seriously interfere with its proper enjoyment for business purposes for which it is best suited. The substantial interference with the beneficial use of their land and the serious depreciation in its value which result from the ordinance amount to a taking of private property without compensation, *Fruth v. Board of Affairs,* 75 W. Va. 456, 84 S. E. 105, L.R.A. 1915C, 981; *State ex rel. Johnson v. City of Charleston,* 91 W. Va. 318, 112 S. E. 577, and, in consequence, the ordinance, in its application to the property of the petitioners, violates Section 9, Article III of the Constitution of this State. This interference in its use and this depreciation in its value also deprive the petitioners of their property without due process of law and deny them the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of

the United States. *Wolff Packing Company v. Court of Industrial Relations*, 262 U. S. 522, 43 S. Ct. 630, 67 L. ed. 1103, 27 A.L.R. 1280; *Nebbia v. People of State of New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. ed. 940, 89 A.L.R. 1469; *Lakewood Express Service v. Board of Public Utility Commissioners*, N. J., 61 A. 2d 730.''

In *State ex rel. Johnson v. City of Charleston*, 91 W. Va. 318, 112 S. E. 577, this Court held in point 2 of the syllabus that when a land owner complies with the building requirements imposed by a municipal ordinance, the city authorities can not arbitrarily refuse the land owner a building permit without a valid excuse for such refusal; ''otherwise, the owner is deprived of the beneficial use of and dominion over his land, and the refusal is tantamount to taking the land without compensation and without due process of law.''

In the leading case of *Fruth v. Board of Affairs*, 75 W. Va. 456, 84 S. E. 105, L.R.A. 1915C 981, which has not only not been ''superseded'' or ''outmoded'', or even criticized, but has been adhered to and cited with approval by this Court in its subsequent decisions and represents the established law of this State, this Court held in point 2 of the syllabus that ''Wherefore anything done by a state or its delegated agent, as a municipality, which substantially interferes with the beneficial use of land, depriving the owner of lawful dominion over it or any part of it, and not within the general police power of the state, is the taking or damaging of private property without compensation inhibited by the Constitution.'' In the opinion this Court reached the sound conclusion, then and now supported by the clear weight of judicial authority, that '' * * * we should not go counter to the great weight of authority and take advanced ground on the question of the police power to regulate and control the use of private property, based on mere aesthetic ground and having no reasonable reference to the safety, health, morals and general welfare of the people at large.'' As the construction of a fence or the relocation of a junk yard at designated distances from a highway,

as required by the statute, involves a mere aesthetic factor which manifestly bears no reasonable relation to the public health, safety, morals, or the general welfare, the legal principle enunciated in the last quoted statement should have been applied with controlling force in the decision of this case.

Reference to and studied consideration of the prior decisions of this Court, involving the award of injunctive relief to a person whose personal or property right is violated or invaded by the maintenance of a nuisance and of the prior decisions of this Court involving the exercise of the police power, cited or discussed in the majority opinion and in this dissenting opinion, show conclusively that this Court, or any other appellate court, has not, in any nuisance case, recognized the aesthetic factor, standing alone, as a proper basis for the award of injunctive relief but instead this Court has expressly rejected it as such in *Parkersburg Builders Material Company v. Barrack,* 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291, 110 A.L.R. 1454, which for some strange and unexplainable reason is cited and relied upon in the majority opinion; and that, until the present decision, this Court has never sanctioned the exercise of the police power on the basis of the aesthetic factor standing alone, but on the contrary has expressly refused to do so in the cases of *State ex rel. Nunley v. Mayor and City Council of the City of Montgomery,* 94 W. Va. 189, 117 S. E. 888; *State ex rel. Sale v. Stahlman,* 81 W. Va. 335, 94 S. E. 497; and *Fruth v. Board of Affairs,* 75 W. Va. 456, 84 S. E. 105, L.R.A. 1915C 981, none of which is "outmoded" or "superseded" or has been overruled, modified, criticized or in any wise departed from, and each of which, being directly in point, is regarded by me, and should have been regarded by the majority, as controlling and binding authority in the decision of this case. None of the four cases cited in this paragraph of this opinion supports, but all of them directly conflict with, the decision of the majority which is not sustained by any decision of an appellate court in any

well considered case in any other jurisdiction in this country. I make particular reference to the many cases cited in the concurring opinion of Judge Kenna in *Parkersburg Builders Material Company v. Barrack,* 118 W. Va. 608, 614, 192 S. E. 291.

I am disturbed by the decision of the majority in this case, not because I like to look at an unsightly junk yard, which I do not like to do, but because, in my opinion, it constitutes an unwarranted extension of the police power to the maintenance and operation of lawful business enterprises as to which the police power bears no actual or substantial relation to the public health, safety, morals or general welfare, but as to which the vague, uncertain and practicably indefinable aesthetic factor may predominate; and I am fearful that the exercise of that far-reaching attribute of sovereignty in any such instance will inevitably result in the violation or destruction of the personal and property rights which the just compensation and due process provisions of the Constitution of this State and the Constitution of the United States were designed and intended permanently to safeguard and preserve. Otherwise stated, I would rather safeguard the constitutional personal and property rights of all the people of this State and in so doing tolerate the proper operation of unsightly and unpopular junk yards within it than to sanction a decision which results in the elimination of junk yards at the cost of the loss or the limitation of fundamental rights which are essential to the freedom of the people.

For the reasons stated and in reliance upon the applicable and controlling authorities cited, quoted from and discussed in this dissenting opinion, I would reverse the judgment of the circuit court to the extent that it upholds the constitutionality of the challenged statute in its general scope and broad outline, as a valid exercise of the police power of the State, but would hold instead that the statute in its entirety is unconstitutional, void and of no force and effect.